JON 0. NEWMAN, Circuit Judge.
The principal issue on this appeal is whether a corporate officer who fails to disburse to a secured creditor proceeds from the sale of inventory in which the creditor has a secured interest incurs a debt that is non-dischargeable in the personal bankruptcy of the officer. Defendant-appellant William K. Banister appeals from a judgment of the District Court for the Northern District of New York (Howard G. Munson, Chief Judge) affirming a decision of Bankruptcy Judge Justin Maho-ney. The judgment against Banister in favor of plaintiff-appellee Wachovia Bank and Trust Co., N.A. (“Wachovia”) for $318,-049 declares that the debt is non-discharge-able under sections 17(a)(2) and (4) of the Bankruptcy Act of 1898, as amended (“the Act”). Because we conclude that, under the circumstances disclosed by the record, a non-dischargeable debt was not incurred, we reverse.
Banister was president and sole stockholder of Northern Yachts, Inc. of Henderson Harbor, New York, a franchised dealer for the Hatteras Yacht Company (“Hatteras”) of North Carolina. To finance the purchase of Hatteras yachts as inventory for ultimate resale to customers, Northern Yachts entered into a floor plan agreement with Wachovia, a North Carolina bank. The agreement contemplated the execution *226 of a promissory note and security agreement for each yacht financed. The arrangement enabled Northern Yachts to acquire inventory by paying only 10% cash, with the bank financing the remaining 90%. The floor plan agreement obligated Northern Yachts to remit to the bank the unpaid balance of each item of inventory promptly upon its sale. The note and security agreement, executed for each yacht financed, provided that, “[t]o secure the payment of the note,” Northern Yachts transfers to Wachovia the yacht “together with all proceeds therefrom.”
The dispute on this appeal arises from the sale of two yachts by Northern Yachts to its customers in the summer of 1973. Wachovia had financed Northern Yachts’ purchase of these two yachts from Harter-as and had received notes totaling $318,-049. Each yacht was sold for cash plus a trade-in, neither of which was turned over to Wachovia. In the fall of 1973, Banister and his wife agreed to guarantee the debts of Northern Yachts to Wachovia up to the amount of $500,000. An involuntary petition in bankruptcy was filed against Northern Yachts in January 1974, and it was adjudicated a bankrupt in April 1974. Banister and his wife filed voluntary bankruptcy petitions in March 1974.
In August 1974 Wachovia filed its complaint against Banister in his personal bankruptcy proceeding. The complaint alleged that Banister had sold the two yachts, failed to remit the proceeds to the bank, and expended the proceeds “for other than satisfying the indebtedness evidenced by” the bank’s notes. It also alleged that “by reason of the misappropriation of plaintiff’s property while [Banister] was acting as an officer of Northern Yachts, Inc.,” he became indebted to the bank in the amount of $318,049. Finally, the complaint sought a declaration that the debt was not dischargeable pursuant to section 17 of the Bankruptcy Act of 1898, as amended, 11 U.S.C. § 35 (1970) (now replaced by section 523 of the Bankruptcy Code, 11 U.S.C. § 523 (1982)). Banister denied the allegations of the complaint and interposed several defenses. The matter languished until 1980, when Judge Mahoney conducted a hearing on the complaint. In February 1982 he entered an order determining that Banister was indebted to Wachovia in the amount of $318,049 and that this debt was non-dischargeable under both sections 17(a)(2) and (4) of the Act.[1] That decision was affirmed by Chief Judge Munson in May 1983.
On appeal Banister raises a variety of issues, but our resolution of one— whether a non-dischargeable debt was incurred — is dispositive. Section 17(a)(2) of the Act makes non-dischargeable any debt resulting- from “willful and malicious conversion of the property of another.” The Bankruptcy Judge ruled that a “conversion” had occurred because Northern Yachts did not turn over to Wachovia the proceeds of the sale of the two yachts. We disagree. Before determining whether Banister’s conduct was sufficiently “willful and malicious” for purposes of the federal non-dischargeability standard, see, e.g., Tinker v. Colwell, 193 U.S. 473, 485-87, 24 S.Ct. 505, 508-09, 48 L.Ed. 754 (1904), we must determine whether, at a minimum, Banister committed the tort of conversion under relevant state law.[2] Though the fi *227 nancing agreements provided that they were governed by the laws of North Carolina, we look to New York law in determining whether Banister’s conduct there constituted a state law tort.[3] See O’Rourke v. Eastern Air Lines, Inc., 730 F.2d 842, 846-51 (2d Cir.1984).
In the absence of a duty imposed upon Northern Yachts to segregate the proceeds and remit those very funds to Wachovia, Banister did not commit the tort of conversion by devoting the proceeds to the corporation’s general business purposes, even though the corporation ultimately defaulted on its obligation to pay Wachovia the unpaid balance of the two promissory notes. See Independence Discount Corp. v. Bressner, 47 A.D.2d 756, 365 N.Y.S.2d 44 (2d Dep’t 1975). Whether the agreements created a duty to segregate the proceeds requires further consideration.
The floor plan agreement obligated Northern Yachts to remit “the Unpaid Balance of the Cost Price of each item of Inventory promptly upon the sale of each such item.” Similarly, the note and security agreement required Northern Yachts, in the event of sale, to “pay promptly to Wa-chovia the amount due upon each item described.” This obligation to pay “the balance” or “the amount due” stands in marked contrast to the language of the acceleration clause, which gave Wachovia the right to declare immediately due all amounts owing if Northern Yachts “fails to remit promptly any amounts received from any disposition of the property.” The bank’s security agreement gave it a right of acceleration in the event that “any amounts received” were not remitted, but imposed upon its debtor only an obligation to pay “the amount due.” The distinction is assuredly a technical one, but a bank, drafting a form agreement that it hopes will create the basis for claiming, in the event of non-payment, the existence of a non-dis-chargeable debt, must select language that unmistakably creates an obligation to hold proceeds separate and to remit “specific money,” Independence Discount Corp. v. Bressner, supra, 47 A.D.2d at 757, 365 N.Y.S.2d at 46 (emphasis in original); cf. In re Simmons, 9 B.R. 62, 64 (Bkrtcy.S.D.Fla. 1981) (floor plan agreement required segregation of proceeds in separate trust account); Hinkle Iron Co. v. Kohn, 229 N.Y. 179, 128 N.E. 113 (1920) (debtor obliged to turn over portion of a “designated fund”).
Nor does such an obligation arise from other clauses of Wachovia’s financing agreements. The note and security agreement does include an obligation to “keep any and all property, in whatever form same may be at any time or times, separate and capable of identification as the property of Wachovia,” but the context in which this obligation is expressed makes it clear that “property” refers to the listed items held as inventory and not to the proceeds from the sale of such items. The only reference to “proceeds” is the following clause: “To secure the payment of this note ... the undersigned hereby transfers and conveys to Wachovia ... the property ... described below, together with all proceeds therefrom____” As the Supreme Court observed with respect to a floor plan agreement for automobiles, “The trust re *228 ceipt may state that the debtor holds the car as the property of the creditor; in truth it is his own property, subject to a lien.” Davis v. Aetna Acceptance Co., 293 U.S. 328, 334, 55 S.Ct. 151, 154, 79 L.Ed. 393 (1934). The quoted language from Wachovia’s agreement created a security interest in the proceeds, which would have existed in any event by virtue of section 9-306 of the Uniform Commercial Code, but did not create an express obligation to hold separate and remit the specific proceeds received upon a sale of an item of inventory. In Independent Discount Corp. v. Bressner, supra, the Appellate Division explicitly recognized that the creditor obtained a security interest in the proceeds of the inventory that had been sold, but nonetheless ruled that no conversion had occurred. That state law rule coincides with our view of federal law that Wachovia, by achieving a secured interest in the procéeds that entitled it, upon compliance with U.C.C. § 9-306, to priority as against other creditors, did not thereby become entitled to pierce the barrier of a bankruptcy discharge. In the absence of a conversion under state law that would satisfy the first requirement of section 17(a)(2) of the Act, we do not reach the further federal law question of whether a conversion would have been “willful and malicious” within the meaning of this provision. See 3 Collier on Bankruptcy ¶ 523.16 at 523-129 n. 37 (15th ed. 1984) (“Mere failure to pay over money received from sale of secured property does not show willfulness or maliciousness so as to constitute willful and malicious conversion.”). We turn then to the Bankruptcy Judge’s alternative ground for decision.
Section 17(a)(4) of the Act makes non-dis-chargeable a debt of the bankrupt “created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity.” The Bankruptcy Judge recognized that the Supreme Court has limited the application of section 17(a)(4) to “technical trusts, and not those which the law implies from contract.” Chapman v. Forsyth, 43 U.S. (2 How.) 202, 208, 11 L.Ed. 236 (1844); see Davis v. Aetna Acceptance Co., supra, 293 U.S. at 333, 55 S.Ct. at 153; Upshur v. Briscoe, 138 U.S. 365, 375-76, 11 S.Ct. 313, 316-17, 34 L.Ed. 931 (1891); Hennequin v. Clews, 111 U.S. 676, 682, 4 S.Ct. 576, 579, 28 L.Ed. 565 (1884). “It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto.” Davis v. Aetna Acceptance Co., supra, 293 U.S. at 333, 55 S.Ct. at 153. As we have ruled in rejecting non-dischargeability under section 17(a)(2), the financing agreements did not create an express obligation requiring Northern Yachts to hold in trust for Wachovia the specific proceeds of inventory sold.[4]
Nevertheless, the Bankruptcy Judge found a non-dischargeable debt under section 17(a)(4), relying on cases such as John P. McGuire & Co. v. Herzog, 421 F.2d 419 (5th Cir.1970); In re Hammond, 98 F.2d 703 (2d Cir.), cert. denied, 305 U.S. 646, 59 S.Ct. 149, 83 L.Ed. 418 (1938); and In re Bernard, 87 F.2d 705 (2d Cir.1937), for the proposition that misuse of funds in disregard of a known obligation constitutes fraud within the meaning of section 17(a)(4). The common denominator of those decisions, however, is that in each case the corporate officer found to have incurred a non-dischargeable debt by using corporate funds in breach of his fiduciary duty had used the money for his personal benefit. In John P. McGuire & Co., the officer had used proceeds from the sale of floor plan inventory to pay creditors to whom he was secondarily liable, the Fifth *229 Circuit expressly noting that section 17(a)(4) “has been applied when an officer of a corporation has misused his position to gain a personal benefit at the expense of the corporation or corporate creditors.” 421 F.2d at 422. In Hammond a corporate director’s liability to his corporation arose from his having profited from the purchase and sale of stock offered to his corporation. In Bernard the liability to the assignee of the corporation arose from the action of the director of an insolvent corporation in distributing corporate funds to himself and his son. In each case, the element of personal benefit was crucial to the holding of a breach of a fiduciary duty to the corporation sufficient to satisfy the requirements of section 17(a)(4). In the instant case, there is no evidence that Banister personally benefited from the proceeds of the sale of the two yachts, and the Bankruptcy Judge did not purport to find that such had occurred. Since Banister neither diverted specific corporate funds expressly required to be held segregated for the creditor’s benefit, see In re Folliard, 10 B.R. 875, 876 (Bkrtcy.D.Md.1981), nor personally benefited from the use of general corporate funds, he did not commit any fraud or misappropriation in a fiduciary capacity within the meaning of section 17(a)(4). Cf. In re Whitlock, 449 F.Supp. 1383 (W.D.Mo.1978) (debt dischargeable that arose out of breach of implied trust in absence of personal gain; debt non-dischargeable that arose out of breach of express trust by virtue of preexisting agency relationship).
The judgment of the District Court is reversed.

. The Bankruptcy Judge adjudicated not only dischargeability but also the existence of liability for the debt and its amount. We agree with Banister that if non-dischargeability had been correctly determined, he would have been entitled to a jury trial on the issues of liability and amount of indebtedness. See In re Merrill, 594 F.2d 1064, 1068 (5th Cir.1979); In re Copeland, 412 F.Supp. 949, 954 (D.Del.1976); Transport Indemnity Co. v. Hofer Truck Sales, 339 F.Supp. 247 (D.Kan.1971); Countryman, The New Dis-chargeability Law, 45 Bankr.L.J. 1, 40-42 (1971); Countryman, Jury Trials on Dischargeability — A Reply to Referee Herzog, 46 Am.Bankr.L.J. 305 (1972).

. Having recognized that Banister would be entitled to a jury trial on the existence of liability for conversion, see note. 1, supra, we nonetheless must review the correctness of the determination, for which the Bankruptcy Judge was the proper fact-finder, see In re Merrill, 594 F.2d 1064 (5th Cir.1979); In re Swope, 466 F.2d 936 (7th Cir.1972) (per curiam), cert. denied, 409 U.S. 1114, 93 S.Ct. 929, 34 L.Ed.2d 697 (1973); Countryman, The New Dischargeability Law, su *227 pra, 45 Am.Bankr.LJ. at 35-40; but see In re Law Research Service, Inc., [1970-73 Transfer Binder] Bankr.L.Rep. (CCH) ¶ 64,528 (Bankr.S.D.N.Y. Dec. 9, 1971); Herzog, The Case for Jury Trials on the Issue of Dischargeability, 46 Am. Bankr.LJ. 235 (1972), that a conversion sufficient to invoke section 17(a)(2) occurred. Even if our ruling on this point were adverse to Banister, he still would be entitled to avoid liability for conversion if he could successfully resist the creditor’s efforts to persuade a jury that a state law tort of conversion had occurred. See Countryman, The New Dischargeability Law, supra, 45 Am.Bankr.L.J. at 41-42; Countryman, Jury Trials on Dischargeability — A Reply to Referee Herzog, supra, 46 Am.Bankr.L.J. at 308; cf. Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510-11, 79 S.Ct. 948, 956-57, 3 L.Ed.2d 988 (1959) ("only under the most imperative circumstances ... can the right to a jury trial of legal issues be lost through prior determination of equitable claims”).

. The choice of law provision in the financing agreements applies North Carolina law to "the contract.” Neither party has urged the application of North Carolina law to the issue of tort liability; rather both have relied on New York law.

. In the absence of such a contractual obligation, we need not decide whether a trust-account obligation can convert a debtor-creditor relationship into a fiduciary, relationship for purposes of section 17(a)(4) of the Act. Compare In re Talcott, 29 B.R. 874, 878-79 (Bkrtcy.D.Kan.1983) (no fiduciary relationship); In re Chambers, 23 B.R. 206, 208-09 (Bkrtcy.W.D.Wis. 1982) (same); In re Graham, 7 B.R. 5, 7 (Bkrtcy.D.Nev.1980) (same); In re Miles, 5 B.R. 458 (Bkrtcy.E.D.Va;1980) (same), with In re Simmons, supra, 9 B.R. at 64-65 (debtor becomes a fiduciary).