In re Daniel Patrick ROUTSON
and Teri Routson, Debtors.

UNIVERSAL PONTIAC–BUICK–GMC
TRUCK INC., a Minnesota Corp.,
and Gary E. Mattox, Plaintiffs,

v.

Daniel Patrick ROUTSON, Dan Routson
of Red Wing, Inc., Dan Routson, Inc.,
and Teri Louise Routson, Defendants.

Bankruptcy No. 3–91–6722.
Adv. No. 3–92–59.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Oct. 25, 1993.

Robert A. Hill, Parsinen Bowman & Levy, P.A., Minneapolis, MN, for debtors/defendants.

David D. Meyer and William P. Simons, St. Paul, MN, for plaintiffs.

## MEMORANDUM DECISION AND ORDER

DENNIS D. O'BRIEN, Bankruptcy Judge.

This nondischargeability action was tried, beginning on June 21, 1993, and ending on June 23, 1993. Appearances are noted in the record. The Court, having received and considered all proper evidence, arguments and briefs of counsel, and being fully advised in the matter, now makes this **ORDER** pursu-

ant to the Federal and Local Rules of Bankruptcy Procedure.

## I.

### STATEMENT OF THE CASE.

Plaintiff Universal Pontiac–Buick–GMC Truck Inc., (Universal Pontiac) was a vehicle dealership located in Red Wing, Minnesota, owned by Plaintiff Gary Mattox. Defendant Daniel Patrick Routson was the owner of Defendant Dan Routson of Red Wing, Inc. This litigation arises out of an agreement between Mr. Mattox and Mr. Routson for the sale and purchase of Universal Pontiac, and Mr. Routson's operation of the dealership under an Interim Management Agreement ("Management Agreement") for approximately seven weeks in 1991.

While operating the dealership under the Management Agreement, Mr. Routson sold 30 vehicles, secured to Norwest Bank, N.A. ("Norwest") under a Universal Pontiac floor plan, without paying for them or accounting to Plaintiffs for the proceeds. During the period, from his agreement to purchase Universal Pontiac through his operation of the dealership under the Management Agreement, Mr. Routson was in the manic phase of a bi-polar, manic-depressive condition.

Payment of the floor plan was guaranteed by the Plaintiffs, who suffered a loss of $326,621 as a result of Mr. Routson's conduct. Mr. Mattox and Universal Pontiac seek judgment against the Defendants for that amount, and judgment of nondischargeability against Defendants Daniel and Teri Routson pursuant to 11 U.S.C. § 523(a)(2)(A), (4) and (6) for fraud, embezzlement, larceny, and conversion under the statutes.[1]

The Routsons deny the alleged amount of the loss, and deny that their conduct resulted in any nondischargeable obligation to the Plaintiffs.

1. Defendant Dan Routson of Red Wing, Inc., is a defunct corporation. This Court has no jurisdiction over that Defendant regarding the cause of action pleaded against it, and the proceeding must be dismissed against the corporation.

2. The use of Universal's dealer license, temporary vehicle permits and floor plan were required during the interim "management" period because those items could not be acquired by Mr.

## II.

### FACTS.

*Agreements and Obligations.*

In the spring of 1991, Daniel Routson negotiated with Gary Mattox to buy his Universal Pontiac dealership in Red Wing, Minnesota. The parties were represented by attorneys and an agreement for sale of the dealership was closed on May 1, 1991.

Mr. Routson took possession of Universal Pontiac at closing pursuant to an agreement, titled "Management Agreement", that was intended to provide for his operation of the business during the interim between the closing and an expected franchise approval by Pontiac. The term "Management Agreement" was somewhat of a misnomer. Mr. Routson's position under the Agreement was more owner, than manager, of the business. He was to employ all the workers at the dealership. He was to open, in his own name, bank accounts for use in connection with operation of the dealership. All used vehicles purchased or taken in trade were to be owned by Mr. Routson. He was to purchase all necessary insurance for the operation of the dealership; assume the lease on the building that the dealership occupied; pay all operating expenses; maintain the equipment; make payments on all leases and service contracts; maintain the books and records of the business; and, receive all profits and be responsible for all losses connected with the operation of the business.

Mr. Routson became custodian of Universal Pontiac's floor plan line of credit at Norwest during this period to facilitate ordinary course operation of the dealership.[2] He assumed all the duties and responsibilities under Universal Pontiac's Floor Plan Agreements.

Routson until Pontiac's expected approval was granted. The Floor Plan Agreements provided the dealer with a method of financing the purchase of vehicles for its retail inventory. The purchase money was borrowed from the floor plan lender; and, the loans made were secured by the individual cars that were purchased with the borrowed funds.

The Norwest Floor Plan Finance and Security Agreements between Universal Pontiac and the bank, were guaranteed by Mr. Mattox. The Finance Agreement provided, in part:

Advances made by Bank under the credit will be paid in full by company without demand *immediately* upon the earlier of: (i) maturity of note, (ii) *the receipt by company of the proceeds of the sale or lease of inventory,* or (iii) the payment date specified on the following curtailment schedule; (emphasis added).

To secure performance of all obligations of company to Bank, Company grants to Bank a continuing security interest in and to the assets ... (the proceeds thereof).

The Norwest Floor Plan Security Agreement provided, in part:

(a) The Borrower has (or will have at the time Borrower acquires rights in Collateral hereafter arising) absolute title to each item of Collateral free and clear of all security interests, liens and encumbrances, except the Security Interest; and the Borrower will defend the Collateral against all claims or demands of all persons other than the Bank. *The Borrower will not sell or otherwise dispose of the Collateral or any interest therein, except that, until the occurrence of an Event of Default under Section 9 hereof and the revocation by the Bank of Borrower's right to do so, the Borrower may sell any Inventory to buyers in the ordinary course of business, but any such sale of Specific Inventory shall be for a price not less than the amount of the Bank's loan (plus accrued interest thereon and the flat charges imposed by Bank) then unpaid with respect thereto. Borrower agrees that, when any Specific Inventory is sold or otherwise disposed of, the Borrower will promptly account to the Bank for the proceeds of such sale and will forthwith pay to the Bank the amount of the Bank's loan* (plus accrued interest thereon and flat charges imposed by Bank) then unpaid with respect to such Specific Inventory. *Pending such payment to the Bank, the payment received by the Borrower on account of the sale of any Specific Inventory shall be held in trust by the Borrower for and as the property of the Bank and shall not be commingled with any funds of the Borrower.* No financing statement covering any or all of the Collateral is now on file in any public office, except financing statements, if any, naming the Bank as secured party. (emphasis added).

The provision requiring that floor planned sales receipts be held in trust, and not be commingled with other funds, was not enforced by Norwest. It was the practice of Universal Pontiac to deposit proceeds from the sale of floor planned vehicles in its general operations account and to pay for the vehicles from that account upon clearing of the checks received in closing the sales. This procedure was accepted by Norwest in the ordinary course of business.

### Breach of the Agreements.

When Mr. Routson took possession of the dealership on May 1, 1991, he opened a checking account at Norwest in the name of Dan Routson of Red Wing, Inc., depositing $100. Proceeds from the sale of Norwest floor planned vehicles were deposited into the account throughout the period that Mr. Routson operated the business, beginning almost immediately. Obligations to Norwest were not timely paid, however. No floor plan payments were made by Mr. Routson until June 3rd, when he paid off nine vehicles.

In the meantime, Mr. Routson used the Norwest account for general business and personal transactions. On May 8, 1991, he paid personal insurance obligations of $10,000 out of the account; and, he paid real estate taxes of $4,864 on real estate wholly unrelated to the Universal Pontiac dealership. On May 9, 1991, Mr. Routson wrote a check on the account to another dealership he owned, in the amount of $25,000.[3] On May 12, 1991, he wrote a check to himself for $30,000. On May 14, 1991, Mr. Routson

---

**3.** Mr. Routson owned two other dealerships at the time, a GMC dealership known as Malkerson Motors ("Shakopee dealership") in Shakopee and a used car operation in Burnsville. The $25,000 check was issued to the Shakopee dealership.

purchased equipment at an auction for $45,-171.[4] On that same day, he used the account to pay a required down payment on the Universal Pontiac dealership itself, in the amount of $10,000.

Not all proceeds from sales of Norwest floor planned vehicles were deposited by Mr. Routson into his Norwest account. Just prior to May 1, 1991, he sold a new 1991 Buick Park Avenue to a customer, the Capesius Agency in Shakopee. The car he sold was from the inventory of the Universal Pontiac dealership, and was floor planned to Norwest. On May 1, 1991, after closing the purchase with Mr. Mattox, Mr. Routson received the proceeds in the amount of $24,663 by check which, at his direction, was made payable to Mr. Routson personally. On May 2, 1991, he deposited the check in his personal account at the Marquette Bank in Shakopee, Minnesota, and used the value created by the deposit for personal living expenses.

Between May 1, 1991, and June 25, 1991, Mr. Routson sold 39 vehicles that were floor planned through the Norwest Floor Plan Agreements. Nine of the cars were paid for on June 3, 1991. Thirty vehicles, having a total value of $445,566.14, were never paid for by Mr. Routson.

Four of the Norwest floor planned vehicles that remained unpaid were cars, purchased by Mr. Routson through his Shakopee dealership, that were also floor planned to General Motors Acceptance Corporation ("GMAC"). The vehicles were displayed at the Shakopee dealership, were never on the Universal Pontiac premises, and were not carried as assets on the books of the Universal Pontiac dealership.

On May 14, 1991, Defendant Teri Routson, Dan Routson's spouse, floor planned these four cars with Norwest, pursuant to Mr. Routson's instructions, as partial security for a $71,500 loan that was deposited in the Norwest account. As a result of the transaction, the vehicles were double floor planned, with Norwest being junior to GMAC. Mr.

Routson sold two of the cars on June 25, 1991, out of his Shakopee dealership. Norwest was not paid. The other two cars remained in the Routsons' possession and were each driven approximately 2,000 miles before being finally sold in mid-September 1991, again without Norwest being paid.

In the latter part of June, 1991, about seven weeks after Mr. Routson had assumed control of the Universal Pontiac dealership, both GMAC and Norwest discovered that their floor plans were substantially out of trust. Numerous floor planned vehicles had been sold at both the Shakopee and Universal Pontiac dealerships without being paid.[5]

The Universal Pontiac dealership, with its assets and liabilities, was returned to Mr. Mattox on June 26, 1991. He liquidated the assets and applied the proceeds to the existing liabilities. Upon complete liquidation, a shortfall existed on the Norwest floor plan in the amount of $326,621. Mr. Mattox subsequently paid that amount to the Bank pursuant to the terms of his Guarantee.

### Daniel Routson's State of Mind.

Daniel Routson was not new to the automobile retail sales industry when he agreed to purchase the Universal Pontiac dealership from Gary Mattox in the spring of 1991. Then thirty years old, Mr. Routson had been in the automobile retail sales industry all of his adult life. Much of his experience had come from his connection with a highly successful dealership in Stillwater, Minnesota, operated by Mr. Routson's father. Daniel Routson had been a minority shareholder and management employee of that business.

Mr. Routson and his father did not relate well on a personal level, a circumstance that increasingly affected their business relationship over the years. While the record is not entirely clear regarding the matter, evidently the personalities of the two men did not present a good mix, and Daniel Routson suffered emotional problems as a result. The senior Mr. Routson was a highly successful, conservative businessman, who tightly con-

---

4. This equipment never became an asset of the Red Wing dealership, but was placed at Mr. Routson's Shakopee dealership.

5. GMAC subsequently took over the Shakopee dealership and supervised liquidation of the remaining inventory. The dealership was then sold with the proceeds paid to GMAC against its floor plan shortfall.

trolled all aspects of his business. Apparently, he cast a long shadow, and Daniel Routson felt lost in it, with little personal or business affirmance and recognition from his father.

In the fall of 1989, Daniel Routson decided to leave the Stillwater operation and strike out on his own. After considerable discord regarding the particulars, he obtained a cash settlement of several hundred thousand dollars from his father for his interest in the Stillwater dealership in early 1990.

Immediately after the buy-out, Mr. Routson began searching for a dealership to purchase. His business goal was to become the biggest and best automobile dealer in the area, eclipsing his father and providing his own affirmance. Mr. Routson was not emotionally healthy. The destructive strategies that he employed, along with his subsequent bizarre behavior and ensuing medical treatment, document his emotional unravelling over the next 18 months.

Mr. Routson's strategy was to acquire a number of dealerships that he believed would give him the economies of scale, buying power, and broad range of products necessary to achieve the reputation and prestige of a major dealer. He first opened a used car dealership in Burnsville, Minnesota. Within a month after that, in May 1990, Mr. Routson agreed to purchase the Shakopee dealership, in Shakopee, Minnesota.

The Shakopee dealership was in disarray and financial trouble at the time Mr. Routson agreed to acquire it. The deal could not be closed until the fall of 1990. In the meantime, Mr. Routson began to realize that he had made a terrible mistake in entering the transaction and confided his misgivings to his father. Eventually, he became so overwhelmed by the prospect of running this business, that he simply "ran away" on the day of the scheduled grand opening of the dealership. Several days later he contacted Mrs. Routson by telephone from Kansas City, where he had been wandering aimlessly. Mr. Routson was without change of clothes or explanation for his behavior. Mrs. Routson made arrangements to meet him somewhere in Iowa, brought him home, and

hospitalized him at Golden Valley Health Center.

During the next five months, Mr. Routson was marginally functional. He experienced great difficulty in making even basic personal decisions, such as what he should eat, what he should wear, and whether he should even get up in the morning. Teri Routson testified, and medical records verify, that in late 1990 and early 1991, Mr. Routson was deeply depressed.

He was incapable of making business decisions, did not participate in running the Shakopee dealership, and could not bring himself to enter the premises. Mr. Routson's depression was characterized by: indecisiveness; vacillation; inability to concentrate; sleeplessness; isolation; general loss of interest in the normal pleasures of life; and, a drastically reduced desire to live. A typical day's activity consisted of laying on a couch and watching television.

By mid-February 1991, Mr. Routson began to recover from his depression. Within a month he was seeking to buy another dealership in Waconia, Minnesota; to establish a Pontiac dealership in Eden Prairie, Minnesota; and, to build a "world headquarters" for his business.

On a Saturday afternoon in mid-April 1991, while on a used car buying excursion, Mr. Routson met Gary Mattox. Mr. Mattox was liquidating a used car dealership. The two men knew of each other, but were not acquainted. During their encounter, the sale of Mr. Mattox's dealership in Red Wing was discussed. Mr. Routson had some familiarity with the Universal Pontiac dealership in Red Wing. He had been interested in possibly purchasing it several years earlier while still at the Stillwater dealership, prior to Mr. Mattox's purchase of the operation.

The men reached an agreement for the sale of the Red Wing dealership on that Saturday afternoon, recording the basic terms on a napkin. The closing took place two weeks later on May 1, 1991. Mr. Routson conducted a "drive by" inspection of the Red Wing dealership, but did not investigate the business prior to the purchase. The

dealership had lost $50,000 during the previous operating year.

Mr. Routson began operation of the Red Wing business on May 1, 1991, and immediately purchased over a quarter million dollars worth of used car inventory at an auto auction to stock the dealership. A short time later, he purchased $45,000.00 in equipment from Mr. Mattox at a liquidating auction held at a Burnsville dealership.

In the second week of June, Mr. Routson agreed to purchase dozens of boats, which he arranged to have delivered to Universal Pontiac, for approximately $200,000.00. He did not have a dealer's license to sell boats; nor did he have the funds to pay for them. When confronted with by these realities by one of his managers, Michael Holderbach, Mr. Routson responded with a terse, "You handle it!" and walked away.

There were other incidents of bizarre behavior by Mr. Routson in the spring and summer of 1991. Mr. Holderbach, general manager of the Shakopee dealership, testified that Mr. Routson's general conduct was vacillating and irrational throughout the period. He would start one task, break it off, and start another. He would purchase unusually large numbers of used cars at wholesale auctions, often at prices well beyond their retail value. Apparently, he even occasionally bid against Mr. Holderbach, who attended some of the same auctions to purchase cars for the Shakopee dealership.

Within a few days after the incident involving the boats, GMAC and Norwest, discovered that several of the same vehicles had been floor planned at both the Shakopee and Red Wing dealerships. When confronted with the double floor planning, Mr. Routson issued a check to cover the deficiency, but it was returned for insufficient funds. Both GMAC (at Shakopee) and Mr. Mattox (at Red Wing) moved in to take over control of the respective dealerships in late June.

In mid-July, Mr. Routson was once again admitted to a hospital for treatment of depression. Dr. Dennis Philander, a psychiatrist who had treated him in his earlier hospitalization, now conclusively diagnosed Mr. Routson's condition as a bi-polar disorder.

Profile of Mr. Routson with the disorder was of a bright person with impaired judgment and disorganized thinking. He had marked mood swings: elevated manic and expansive moods of hyperactivity; and, severely depressed moods of near total inactivity, despair and feelings of hopelessness.

During manic phases, Mr. Routson's judgment was diminished and impaired by irrational feelings of grandiosity and the belief that whatever he did would be successful. During these periods, his behavior was often compulsive, driven by strong feelings of power and self-esteem. He pursued grandiose schemes, thinking that there could be no adverse consequences to his actions because nothing he would do could fail.

During depression phases, Mr. Routson suffered overwhelming despair and helplessness. Hospital records indicate contemplation of suicide, and Mr. Routson testified that as early as October of 1990, he contemplated killing himself in several ways, including driving his car off a bridge, an embankment, or into a steel girder. Mr. Routson also testified that at times he suffered such drastic loss of self-esteem and confidence that he felt completely hopeless.

By the end of August, Mr. Routson's Shakopee and Burnsville businesses had been closed, and Mr. Mattox had closed Universal Pontiac. Mr. Routson had been discharged from his second hospitalization and had received additional treatment for depression at another facility, Hazelden Treatment Center. He and Mr. Mattox attempted to perform, and agree upon, an accounting for Universal Pontiac as required by the Management Agreement. However, they disagreed over the extent of losses that had been incurred between May 1, 1991, and June 26, 1991, and the matter was never resolved.

Daniel and Teri Routson filed bankruptcy in January 1992. In the time between leaving the Stillwater dealership in late 1989 and the end of June, 1991, Mr. Routson lost more than one and one-half million dollars, including his homestead and everything else he owned.

## III.

## CLAIMS, DEFENSES AND FOCUS.

### The Claims.

The Plaintiffs claim that the Defendants' conduct in failing to pay the Norwest floor plan obligations constituted: misrepresentation and actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A); embezzlement and larceny within the meaning of 11 U.S.C. § 523(a)(4); and, willful and malicious injury to property, through conversion, within the meaning of 11 U.S.C. § 523(a)(6). They seek judgment against the Defendants in the amount of $326,621, and nondischargeability of the debt under these statutes.

### The Defenses.

Defendants argue that a "clear and convincing" standard of proof applies to all of Plaintiffs' claims. They assert that: with respect to the 11 U.S.C. § 523(a)(2)(A) claim, Plaintiffs have failed to prove fraudulent intent; with respect to the 11 U.S.C. § 523(a)(4) claim, Plaintiffs have failed to prove the requisite intent of Defendants to harm Plaintiffs; and, with respect to the 11 U.S.C. § 523(a)(6) claim, Plaintiffs have failed to prove either conversion or maliciousness by Defendants.

### The Primary Focus.

The following analysis begins with a discussion of the burden of proof because the determination applies to all claims. The core claim of this litigation is 11 U.S.C. § 523(a)(6), as it relates to the alleged wrongful conversion by the Defendants of Norwest's collateral. Conversion was the primary focus at trial. The analysis treats that claim first because it determines the litigation; and, because the discussion facilitates a more ready understanding of the application of the other claims. The entire discussion of the claims pertains to facts and law as they relate to the conduct of Daniel Patrick Routson, except for the specific section that deals with liability of Teri Routson.

## IV.

## ANALYSIS AND CONCLUSIONS.

### Burden of Proof.

██ The Defendants argue that the burden of proof in dischargeability cases is by

clear and convincing evidence, especially regarding 11 U.S.C. § 523(a)(2)(A) and (6), citing *In re Dougherty,* 84 B.R. 653 (9th Cir. BAP 1988); *In re Littleton,* 106 B.R. 632 (9th Cir. BAP 1989); and, *3 Collier on Bankruptcy,* para. 523.08[5]. However, the burden is by preponderance in connection with the 11 U.S.C. § 523(a)(2)(A) dispute. *See Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). There seems no reason why the *Grogan* rationale is not equally applicable to 11 U.S.C. § 523(a)(4) and (6). *See Hammond v. Gee,* 156 B.R. 291 (Bankr. W.D.Wash.1993). The Court holds that the burden of proof on all Plaintiffs' claims under 11 U.S.C. § 523(a)(2)(A), (4) and (6) is by preponderance, not by clear and convincing evidence.

### Conversion.

11 U.S.C. § 523(a)(6) provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or the property of another entity;

Wrongful conversion of a secured party's collateral is covered by the statute. Debts that result from such conduct are ordinarily nondischargeable in a Chapter 7 bankruptcy case.

The Defendants argue that:

1) Mr. Routson did not convert Norwest collateral;

2) even if he had converted Norwest collateral, the Plaintiffs did not have an interest in it and, therefore, they have no claim under 11 U.S.C. § 523(a)(6);

3) Mr. Routson's conduct was not malicious because he believed that he had complete, autonomous ownership and control of Universal Pontiac as of May 1, 1993, and his use of funds was consistent with that belief; and,

4) Mr. Routson could not form a malicious intent because of his bi-polar condition.

These arguments are discussed in the order listed above.

1) *Did Mr. Routson convert Norwest's collateral by depositing proceeds from the sale of floor planned vehicles into a general account and using the value thereby created for purposes other than paying floor plan obligations on the vehicles sold?*

■ Norwest did not enforce the provision in the Floor Plan Security Agreement that required sales proceeds of floor planned vehicles to be segregated and held in trust pending their payment to Norwest. The Defendants contend that when the proceeds became commingled with other funds in a general operating account, their identity as proceeds were lost, and the bank no longer had a security interest that it could enforce. They argue that, since Norwest waived its security interest in the proceeds by consenting to the commingling, the bank had no interest in personal property that could be converted upon later expenditure of funds from the general account for purposes other than paying Norwest. The Defendants rely primarily upon *In re Littleton,* 106 B.R. 632 (9th Cir. BAP 1989); *Wachovia Bank and Trust Co. v. Banister,* 737 F.2d 225 (2nd Cir.1984); and *In re Shah,* 96 B.R. 290 (Bkrtcy.C.D.Cal.1989) as support for their position. The argument is not persuasive.

Norwest authorized the deposit of its secured proceeds into a general, commingled operating account. However, the authorization was on the condition that the floor plan debtor preserve the deposit value created in the account for the purpose of paying the floor plan obligation. Payment was expected upon clearing of the deposited checks that represented the sales proceeds. Deposit into a general account for any other purpose was unauthorized. Mr. Routson regularly caused the deposit of Norwest collateral proceeds into general commingled accounts for the purpose of using the resulting value other than to pay Norwest. This conduct, together with actual later unauthorized use of the value created by the deposits, constituted actionable conversion. To the extent that the rationale in the above-cited cases is inconsistent with this analysis, the Court rejects it.[6]

2) *Did the Plaintiffs have an interest in the converted collateral, sufficient to support a claim under 11 U.S.C. § 523(a)(6)?*

■ The Defendants assert that Plaintiffs had no rights in the collateral at the time of the actions complained of and, therefore, that they have no cause of action against the Defendants related to conversion. The argument is premised upon the law of conversion in Minnesota. Necessary elements of actionable conversion are: (1) a plaintiff's ownership or right to possession of the property at the time of the conversion; (2) a defendant's conversion by wrongful act or disposition of plaintiff's property rights; and, (3) damages. *See Bloomquist v. First Nat'l Bank,* 378 N.W.2d 81 (Minn.Ct.App. 1985).

The Defendants argue that:

[t]he Management Agreement between Dan Routson and Universal, at paragraph 4(c), requires Routson to conduct all business of the dealership through Routson's general accounts. Second, under the provisions of the agreements between these parties, neither Universal nor Mattox was a secured party or an owner of the proceeds of the cars sold by Routson after he assumed control of the Red Wing dealership on May 1, 1991. Universal had no special interest in the collateral securing

---

**6.** The cases relied upon by Defendants on the issue consider these types of transactions too narrowly, focusing only on the subsequent use of value created by the deposits in the general account. A creditor, who authorizes deposits of collateral proceeds into a general commingled account, gives up its security interest in the proceeds, and thereby voluntarily jeopardizes its position with respect to other creditors. However, that does not change the fact that deposits into the account for *unauthorized* purposes constitute wrongful conversion, which becomes actionable when the value is lost through the unauthorized use. The cases cited by the Defendants seem to take an unnecessarily fragmented and technical approach to the analysis. The approach ignores the realities of these transactions; and, it disregards ordinary course of business understandings and expectations of the parties.

its debt because the security agreement in this case provides that Norwest Bank—not plaintiffs—is the only entity possessing the right to take immediate and exclusive possession of the collateral in the event of a default. Universal's remedy was an accounting and adjustment of accounts in the event the transaction was not consummated. Thus, under Minnesota law, Plaintiffs do not have a sufficient possessory interest to state a cause of action for conversion. *Defendants Post-trial Mem.*, at 12.

The argument is not persuasive.

Mr. Routson's handling of Norwest's collateral proceeds constituted actionable conversion in favor of Norwest. The Plaintiffs paid the resulting loss as guarantors of the account, and became subrogated to the rights of Norwest against the Defendants, including rights of action for both conversion and non-dischargeability of the resulting debt. *See In re Minnesota Kicks, Inc.*, 48 B.R. 93 (Bankr.D.Minn.1985); and, *Martin v. Federal Surety Co.*, 58 F.2d 79 (8th Cir.1932). Accordingly, the Plaintiffs have a claim under 11 U.S.C. § 523(a)(6) against Defendants.

> *3) Did Mr. Routson's conduct lack malice under 11 U.S.C. § 523(a)(6) because he believed that he had complete, autonomous ownership and control over Universal Pontiac as of May 1, 1991, and his use of funds was consistent with that belief?*

The Defendants focus on statutory "malice" as it relates to Mr. Routson's conduct pertaining to the Plaintiffs. They argue:

> Dan Routson may have used funds inappropriately and pursuant to unwise and irrational business decisions, but he had no intent or expectation of harm to Mattox or Universal. The contractual requirement that the parties "settle up" at the end of the management period, meant that Routson would ... simply be increasing his own liability if his plans failed. His inability to satisfy those liabilities at the end of the management period cannot be bootstrapped into imputed malice at the onset

of the transaction. *Defendants' Post-trial Mem.*, at 19.

However, the Plaintiffs' 11 U.S.C. § 523(a)(6) claim is derivative of Norwest's rights against the Defendants. The relevant inquiry is whether Mr. Routson's conduct pertaining to Norwest was "malicious." Consideration of that question, focuses the discussion on the core issue of this litigation.

> *4) Was Mr. Routson incapable of "malicious" conduct in handling Norwest's collateral proceeds because of his manic-depressive condition?*
>
>> *a) The meaning of "malicious" in 11 U.S.C. § 523(a)(6).*

Much has been written, and many cases have been cited by the parties, on the meaning of the term "malicious" in 11 U.S.C. § 523(a)(6). Only a few of the cases are included in the discussion here. The first is *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934).

Mr. Davis sold, at retail, vehicles that he purchased with loans from Aetna Acceptance ("Aetna") through a floor planning finance arrangement. Under the agreement, Mr. Davis was prohibited from selling floor planned vehicles without the written consent of the lender. However, during the relationship with Aetna, he often sold floor planned cars without the required consent, and later accounted for the proceeds. This was known, and accepted by Aetna.

The last sale was the subject of the litigation. A salesman, employed by Mr. Davis, sold a floor planned car without obtaining written consent from Aetna. Mr. Davis informed the lender of the sale, as he had done on other sales in the past, and promised to account for the proceeds. Instead, he filed bankruptcy.

Aetna sued in Illinois state court for conversion. Mr. Davis pleaded his bankruptcy and discharge as a defense. The state trial court rejected the plea and entered judgment for Aetna.[7] The Illinois appeals court affirmed and the U.S. Supreme Court accepted

---

7. Under the Bankruptcy Act, dischargeability issues were initially determined in state courts. Discharge was an affirmative defense to a post-

bankruptcy action by a creditor on a pre-bankruptcy debt.

Mr. Davis' petition for certiorari. Resolution of the dispute turned on whether the transaction resulted in a conversion, constituting "willful and malicious injuries to the ... property of another" under 11 U.S.C. § 35(2) of the Bankruptcy Act, thereby excepting the debt from Mr. Davis's discharge.

Under Illinois law, malice and wrongful intent were not necessary elements to the cause of action for conversion. Negligent conversion was recognized as a viable cause of action. In fact, the trial court specifically found that Mr. Davis:

'was not actuated by willful, malicious or criminal intent in disposing of the car in question.'

*Davis*, 293 U.S. at 332, 55 S.Ct. at 153.

Mr. Davis was found to have converted Aetna's property under Illinois law. But the Supreme Court noted that the lower courts did not find, and the record did otherwise support, a conversion that was "malicious" within the meaning of 11 U.S.C. § 35(2) of the Bankruptcy Act. The Supreme Court, in overruling the Illinois appeals court on the discharge issue, said:

[A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one. ... The discharge will prevail as against a showing of conversion without aggravated features.

*Davis*, 293 U.S. at 332, 333, 55 S.Ct. at 153, (citations omitted).

The *Davis* Court simply ruled that negligent conversion is not "malicious" injury to property within the meaning of the term as used in the exception to discharge provisions of the Bankruptcy Act, now found in 11 U.S.C. § 523(a)(6) of the Bankruptcy Code.[8]

The record in that case did not support any other conversion, and Mr. Davis prevailed.

The passage quoted above suggests that the *Davis* Court left the door open for discharge of debts resulting from other, non-negligent conversion scenarios as well. The Supreme Court said that:

In these *and like cases,* what is done is a tort, but not a willful and malicious one. ... *The discharge will prevail as against a showing of conversion without aggravated features. Id.* (emphasis added).

In this District, a bankruptcy court ruled that the killing of secured cattle by a farmer to feed himself and his family was not malicious conversion. *See Thorp Credit and Thrift Company v. Pommerer,* 10 B.R. 935 (Bankr.D.Minn.1981). This Court held that conversion of an abusing spouse's coin collection, by the victim of the abuse, to provide necessary living expenses for her and her young children while on the run from the abuser, was not malicious conversion. *See Kruger v. Kruger (In re Kruger),* Ch. 7 Case No. 3–91–1931, Adv. No. 3–91–165, slip op. (D.Minn. 3rd Div. April 6, 1992). These cases, while involving conduct that is knowing and headstrong beyond negligence, present circumstances of "conversion without aggravated features."

The only Eighth Circuit Court of Appeals case addressing the phrase "willful and malicious" in the context of 11 U.S.C. § 523(a)(6), is *In re Long,* 774 F.2d 875 (8th Cir.1985). In *Long,* the Court of Appeals said:

We are convinced that if malice, as it is used in § 523(a)(6), is to have any meaning independent of willful it must apply only to conduct more culpable than that which is in reckless disregard of creditors' economic interest and expectancies, as distinguished from mere legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice, absent some additional "aggravated circumstances," under *Davis* and its recent progeny.

---

8. Where an act that results in conversion is motivated by the erroneous belief that the interest converted has been satisfied or waived; or, where the conversion is without knowledge of the interest converted, the conversion might be negligent, even though the act is intentional. In those instances of negligent conversion, the acts are not willful and malicious, under *Davis.*

*Long,* 774 F.2d at 881.

The *Long* Court did not furnish any examples of "aggravated circumstances", but it did say that nondischargeable conduct must be "targeted at the creditor" such that "the conduct is certain or almost certain to cause financial harm." *Id.* at 881. Understanding the facts of the case is necessary to appreciate the potential significance of the decision.

Mr. Long was an officer, director, and controlling shareholder of A & C Johnson Co. (A & C). Barclays American Business Credit ("Barclays") loaned substantial sums of money to A & C, secured by accounts receivable. Proceeds from the accounts were also covered, and A & C was obligated under its agreements with Barclays to segregate and deposit the proceeds into a special "collateral" account. Mr. Long guaranteed the loans.

The business of A & C was not successful, and, near the end, Mr. Long diverted $139,-000 of Barclay's collateral proceeds into a new corporate account. The diverted proceeds were used for attorney's fees and other expenditures to keep A & C functioning as an active business, an effort that soon failed.

Mr. Long subsequently filed bankruptcy, and Barclays sued to have its debt excepted from discharge under 11 U.S.C. § 523(a)(6), based on willful and malicious destruction of its property through conversion of its collateral proceeds. The bankruptcy court ruled in Mr. Long's favor and the district court affirmed. So did the Eighth Circuit Court of Appeals. In discussing the facts, the Circuit Court said:

> Long acknowledges that he knew the diversion of funds to a corporate account rather than the "collateral" account was contrary to the contractual arrangement with Barclays. The breach of contract was thus a flagrant one, born of apparent desperation over the financial plight of A & C. The more serious barrier to Barclays' claim is presented by the requirement that there be a finding of malice. There are more factors favoring Barclays than there were favoring the creditor in Davis. As found by the courts below, Long was gambling with Barclays' property. [FN9] Long testified candidly that he knew he

> was breaking the contract with Barclays by diverting money from the collateral account. He does not contend he supposed Barclays would have consented to the diversion, even in light of his purported purpose of saving the business and preventing losses to all creditors, including secured creditors whose security might prove inadequate on forced liquidation. While there were arguably some expenditures for his personal benefit, insofar as losses were shifted to Barclays they resulted in further liability on Long's guarantys [sic]. [FN10] While Long admitted some "inadvertent" use of the diverted moneys, in that all was not used for the intended purpose of meeting "critical" corporate obligations, the admission apparently relates to items such as a $38 payment for an airline guide. Such expenditures are de minimis, considering the magnitude of the claim.

*Long,* 774 F.2d at 881, 882.

Later, the Court observed:

> If the business could have been saved, Barclays could have benefitted by hundreds of thousands of dollars. While Long may have committed a tort, and his conduct must be disapproved, we are not convinced that there was error below in ruling that he did not act maliciously, as that term is used in this context.

*Id.,* at 882.

Finally, the *Long* Court ends with this admonition:

> Debtors who willfully break security agreements are testing the outer bounds of their right to a fresh start, but unless they act with malice by intending or fully expecting to harm the economic interests of the creditor, such a breach of contract does not, in and of itself, preclude a discharge. If Congress wishes to tighten or redefine the nondischargeability rule in question, it can amend the Code as it did last year to prevent discharge from drunk driving damages.

*Id.,* at 882.

In light of the facts of the case, it is difficult to discern the intended message of *Long.* One is initially confronted with the apparent premise that it is acceptable con-

duct for a debtor to convert a secured party's collateral pre-petition: where the converted property is used in a good faith attempt to save a failing business; and, where the debtor has a good faith basis to believe that if the business can be saved as a result of the conversion, all creditors, including the secured party, will benefit. Such a premise, however, is untenable. Not only is the proposition completely contradictory to the general civil and criminal law of secured transactions,[9] but it is totally foreign to current and historic insolvency and reorganization laws and concepts.[10] To hold that debts resulting from conversion under such circumstances are dischargeable, is to provide financially distressed debtors a powerful self-help remedy that is without legal or equitable precedent.

The true message of *Long* is probably not in the facts of the case. It was initially heard by Bankruptcy Judge Kenneth G. Owens, who died before deciding the controversy. The decision was rendered in the bankruptcy court by another judge on the written record, and was affirmed in the district court through an unreported opinion. Under the circumstances, the Circuit Court was simply "not convinced that there was error below in ruling that [Long] did not act maliciously, as the term is used in [11 U.S.C. § 523(a)(6) ] context." *Long*, 774 F.2d at 882. Had the court below found that Mr. Long acted maliciously, the Circuit Court would likely have affirmed the decision under the same "clearly erroneous" standard of review that it used in affirming the findings in his favor on the issue.

■■■ The precedent of *Long* is the Court's adoption of the meaning of "willful and malicious injury" as described by the Restatement (Second) of Torts, § 8A, Comment b. The Court established this meaning of the phrase:

> When transfers in breach of security agreements are in issue, we believe nondischargeability turns on whether the conduct is (1) headstrong and knowing ("willful") and, (2) targeted at the creditor ("malicious"), at least in the sense that the conduct is certain or almost certain to cause financial harm. *Long*, 774 F.2d at 881.[11]

Loss to the creditor of the interest in the property converted, is, ordinarily, sufficient financial harm to make a willful conversion malicious. Ultimate failure to pay the secured debt is simply the ripening of the harm into a viable cause of action for fixed damages. The misconduct that results in nondischargeability is the incident of *knowingly, intentionally and wrongfully destroying the interest converted,* not the later failure to pay the underlying debt from some other source.

■■■ Inquiries into intentions and expectations to later remedy the harm caused by the conversion are irrelevant to issues of culpability and accountability for the misconduct itself. Such intentions and expectations cannot neutralize the "aggravated features" of the conversion any more than the intent to replace stolen money, prior to discovery of a

9. Allowance of such conduct without accountability, would render security interests, which are well defined and established in civil law, illusory. Non-negligent conversion of secured property, without legal excuse, is a felony in Minnesota. *See: Minn.Stat.* § 609.62, Subds. 1 and 2.

10. Neither the Bankruptcy Code, nor the prior Bankruptcy Act, has ever been interpreted or applied to allow the arbitrary stripping of a valid, perfected security interest from a creditor, either: to redistribute its value to general creditors; or, to contribute the value to a reorganization effort. Avoidance powers have been rationally based, generally well defined, and limited.

11. This description accommodates the ruling in *Davis*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393, in that negligent conversion is not headstrong and knowing. However, the description does not seem to accommodate the conduct of the farmer, who kills the cow to feed a hungry family; or, of the abused spouse, who sells the abuser's coin collection to sustain herself and her young children while on the run from the abuser. The description should be qualified to exclude financially harmful conduct that involves exceptional circumstances, which tend to neutralize otherwise "aggravated features." A good description of the term "malicious" is articulated in *Morton v. Kemmerer*, 156 B.R. 806 (Bankr. S.D.Ind.) In that case, the court said:

> [u]nder 11 U.S.C. section 523(a)(6), an act is "malicious" only if it is a wrongful act done without just cause or excuse, which (1) the debtor commits with the specific intent to harm another or another's property, or (2) which is substantially certain to cause harm to another or another's property.
> *Morton,* at 809.

theft, can erase the criminal features from the act. That is why Mr. Routson's mental condition cannot be a successful defense against the claim here.

### b) Mr. Routson's conduct in converting Norwest's collateral proceeds was malicious.

■ Mr. Routson's handling of Norwest's collateral proceeds occurred during his manic phase of a bi-polar manic-depressive condition. During this period, Mr. Routson's judgment was impaired, as a result of an elevated or expansive mood that caused him to believe, however irrationally, that nothing he might do could fail. Put another way, he believed that everything he might do would be successful. Under the influence of his manic mood, Mr. Routson could not appreciate the probable adverse consequences of his actions because he believed that there would be none. He believed that Norwest would ultimately be paid because his business and all his strategies would be successful. However grandiose and irrational these beliefs might be from the normal perspective, Mr. Routson's was not the normal perspective. It was a manic perspective. Yet, his beliefs and intentions, however based, are irrelevant to the consideration of his culpability.

Mr. Routson knew right from wrong during the manic phase of this condition. His was a mood disorder, not a thought disorder.[12] Mr. Routson understood the concept of floor planning vehicles. He knew that it was wrong to sell floor planned vehicles without paying for them, either from the proceeds or the value created by their deposits. Indeed, Mr. Routson chose to convert Norwest's proceeds with full knowledge that it was wrong. He did so because he had other,

more immediate, uses for the money; and, in his judgment, he believed that he would be able to cover the Norwest obligations at a later time from other sources.

Mr. Routson's impaired judgment caused his inability to rationally assess his prospects of later satisfying the underlying debt to Norwest, in light of the scale of his conversion of the bank's collateral. But, whether rational or not, Mr. Routson's beliefs, intentions and expectations are irrelevant to the issue of his culpability for the conversion itself. Mr. Routson knew that it was wrong to sell the vehicles and divert the proceeds to other uses without first paying Norwest; and, he intentionally converted the proceeds to unauthorized uses, knowing and intending that his actions would destroy Norwest's financial interests in property converted. Accordingly, Mr. Routson's conduct constituted willful and malicious injury to Norwest's property rights.[13]

### 5) Summary on Conversion.

In summary, Mr. Routson willfully and maliciously converted Norwest's interest in proceeds from the sale of floor planned vehicles. Plaintiffs, who paid the resulting loss to Norwest by honoring their guarantees, became subrogated to Norwest's rights against Mr. Routson, including the right to actions for conversion and nondischargeability of the resulting debt.

### Fraud, Embezzlement, and Larceny.

#### 1) The Statutes.

11 U.S.C. § 523(a)(2)(A) provides, in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

---

**12.** A "thought disorder" references a condition that results in conduct which the actor cannot measure "right" or "wrong" because actions themselves are products of cognitive dysfunction. For instance, one who acts upon the belief that: he is being chased by the devil; spoken to by a refrigerator; or, instructed by a spirit through hidden messages in cloud patterns, is likely to be suffering from a thought disorder.

**13.** Defendants rely heavily on In re Fontenot, 89 B.R. 575 (Bkrtcy.W.D.La.1988), in support of their claim that Mr. Routson's bi-polar condition

rendered him incapable of acting maliciously. Fontenot is more thoroughly discussed in the next section of this Memorandum Decision and Order. However, it is appropriate to observe here that the case did not involve conversion of another's property, or consideration of 11 U.S.C. § 523(a)(6) concepts of willful and malicious injury to property. The case involved allegations of fraud, embezzlement and larceny. As discussed in the next section, the nature of Mr. Fontenot's alleged misconduct was critically different from Mr. Routson's.

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

   (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(4) provides:

   (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

   (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

*2) Analysis of In re Fontenot.*

The nondischargeability case of *In re Fontenot,* 89 B.R. 575 (Bkrtcy.W.D.La.1988), is remarkably similar to this case in that the debtor suffered from the same bi-polar condition as Mr. Routson. In fact, Mr. Fontenot experienced many of the same documented symptoms, and he behaved in much the same manner as Mr. Routson. However, the crucial difference between the cases is in the nature of the alleged misconduct. Mr. Fontenot was not accused of conversion, and the case did not involve 11 U.S.C. § 523(a)(6), or application of the concept of "willful and malicious." He was accused of fraud, embezzlement and larceny; and, concepts of 11 U.S.C. § 523(a)(2)(A) and (4) were involved. An understanding of *Fontenot* is helpful to the analysis of similar claims in this case. It is also useful in drawing a critical distinction between the types of alleged culpable acts in these cases; and, in understanding why Mr. Routson's mental condition is not a sustainable defense to nondischargeability under either 11 U.S.C. § 523(a)(2)(A) or 11 U.S.C. § 523(a)(4).

Mr. Fontenot was an architect retained to design and supervise the construction of an addition to a residence. He performed all his obligations under the retention agreement except one. Mr. Fontenot failed to pay subcontractors even though he had received the total contract price, which included all labor and material costs for the project from the owner. The subcontractors filed liens against the residence. Mr. Fontenot used the money that he received for the job to pay similar obligations from prior projects. He testified that he did not perceive himself to be in financial trouble when he paid the unrelated bills and that he fully intended to pay the labor and material costs pertaining to the residence out of other funds. The owner ultimately paid the costs in the amount of $15,588, and later sued for nondischargeability of the debt in Mr. Fontenot's subsequent bankruptcy.

One basis for the litigation was 11 U.S.C. § 523(a)(2)(A), on the allegation that Mr. Fontenot obtained money by false pretenses, false representation, or actual fraud. In ruling in favor of Mr. Fontenot on the false pretenses and misrepresentation issues, the court said:

> [t]he evidence is clear and credible that defendant did intend to pay potential lienors. His failure to pay his suppliers at the time he was paid by the plaintiff does not preclude a valid intention to pay them subsequently. While the evidence is clear that defendant Fontenot used money from the Dutreix project to pay materialmen on other jobs, defendant Fontenot still intended to pay the suppliers on the Dutreix project.

*Fontenot,* at 580.

In ruling in his favor on the actual fraud claim, the court said:

> Mr. Fontenot's manic states during bi-polar depression, together with credible testimony that it is [sic] his intent to pay the materialmen on the Dutreix job, precludes a finding that he directly and actively intended to cheat another. Mr. Fontenot's experienced high states of optimism is consistent with subjective good-faith intent to fulfill his obligations.

*Id.,* at 581.

The focus of the 11 U.S.C. § 523(a)(2)(A) inquiry was whether he ever intended in good faith to pay the obligations, *not* whether Mr. Fontenot converted or otherwise misused the funds that he received for the residence project. The argument concerned the alleged fraud of Mr. Fontenot in *obtaining* the money.

The second basis for the nondischargeability litigation was 11 U.S.C. § 523(a)(4), on allegations of embezzlement and larceny. By these allegations, Mr. Fontenot's culpability *was,* in part, sought to be measured by his *use* of the money he received for the residence project. However, the court, again ruling in his favor, stated:

> Embezzlement is defined by Collier at paragraph 523.14 as: the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking. The facts of the present case are inconsistent with fraudulent intent. The work defendant had engaged to perform had been completed at various stages when he received payments; further, he intended to pay the materialmen. Fraudulent intent requires moral turpitude or intentional wrong.
>
> *Id.,* at 582.

Mr. Fontenot received his discharge.

### 3) Mr. Routson's Fraud.

■ The Plaintiffs argue that:

> Routson's conduct in this case is analogous to the credit card cases which provide that a debtor who incurs obligations without any intention to repay is committing actual fraud. . . . A debtor who, after negotiating the purchase of an auto dealership and a floor plan line of credit, begins on the first day of business to embezzle sales proceeds and sell cars out of trust can have only one intention and that is to commit fraud. Obviously Routson never had the slightest intention to pay his obligations; his promises to Mattox were fraudulent lies.
>
> *Plaintiffs' Post-trial Mem.,* at 14, (citations omitted).

But Mr. Routson had every intention of paying his obligations. And, he believed, however irrationally, that he would be able to pay them. Mr. Routson's fraud was not his representation and intention regarding general payment of the obligations. Mr. Routson's fraud was his representation, intention and

conduct regarding compliance with the Floor Plan Agreements.

The floor plan arrangement was not a minor matter in the transaction between the parties. It provided a substantial continuing source of credit, without which Mr. Routson could not operate Universal Pontiac. Mr. Mattox remained personally liable on the account, by his guarantee. These gentlemen were both intimately familiar with the operation of motor vehicle dealerships. They both understood the concept of floor planning: how it works; what the responsibilities of the borrower are; and, the importance of compliance with the terms of the *Floor Plan Agreements.* At a minimum, Mr. Routson impliedly represented that he would comply with the Floor Plan Agreements until the purchase could be finally closed and Mr. Mattox was no longer involved. Without such an implied representation and expectation, there would have been no transaction.

Mr. Routson never intended to comply with the Floor Plan Agreements. His actions on the very first day of operating Universal Pontiac present ample evidence. Mr. Routson closed the sale on a Norwest floor planned vehicle on May 1, 1991, deposited the proceeds into his personal account, and used the value created for personal expenses. That incident was the first of what formed a pattern of regular and consistent violations of the Floor Plan Agreements throughout his operation of Universal Pontiac.

### 3) Embezzlement and Larceny.

■ Unlike the circumstances in *Fontenot,* Mr. Routson's conduct, in wrongfully converting Norwest's collateral proceeds, fits the description of both embezzlement and larceny referenced in that case. In *Fontenot,* neither the residence owner nor the subcontractors had any contractual or other legal interest in the money paid to Mr. Fontenot after he received it. And, he intended to fulfill his general obligations under the contract. In contrast, here, Norwest had a continuing interest in the proceeds received by Mr. Routson from the sale of floor planned vehicles. And, while he, too, intended to ultimately pay his general obligations under the Agreements, Mr. Routson fraudu-

lently appropriated the property for purposes other than satisfying Norwest's interest in it.

#### 4) Summary on Fraud, Embezzlement and Larceny.

Mr. Routson's conduct, in his planned and actual handling of Norwest's collateral proceeds, constituted both misrepresentation and actual fraud committed against the Plaintiffs. The same conduct constituted embezzlement and larceny committed against Norwest. The Plaintiffs hold the latter two nondischargeability claims against Mr. Routson, derivative of their payment of the loss to Norwest on the guarantees.

**Teri Routson's Conduct.**

No persuasive evidence that Teri Routson knew of, or participated in, the nondischargeable conduct of Daniel Routson, has been offered in this case. She was not an owner of Dan Routson of Red Wing, Inc. The only evidence linking her to any misconduct was her administrative act of supplying Norwest with the identification of four GMAC floor planned vehicles in connection with floor planning the same cars with Norwest. But it has not been shown that Mrs. Routson was other than an innocent messenger in the transaction, simply following instructions of Mr. Routson. The record does not sustain her liability to the Plaintiffs, derivative or otherwise, and the question of nondischargeability is not reached.

**Damages.**

Mr. Mattox testified that he and Universal Pontiac were called upon to pay the deficiency in the Norwest Floor Plan account occasioned by Mr. Routson's failure to account to the bank for the secured proceeds of vehicle sales under the floor plan. The Plaintiffs paid Norwest the total sum of $326,621 on their guarantees, according to Mr. Mattox.

The Defendants do not challenge these allegations. However, they argue that, due to Plaintiffs' accounting irregularities and questionable liquidation procedures, they have failed to prove damages. In support of the position, the Defendants point to apparent inconsistencies in certain of Plaintiffs' financial documents regarding the liquidation of Dan Routson of Red Wing, Inc.; [14] and, alleged self-dealing and "fire sales" regarding certain Routson used cars, after Mr. Mattox took back the dealership in late June of 1991.[15]

When the serious floor plan problems were discovered in June, Mr. Mattox took back control of Universal Pontiac and obtained an assignment from Mr. Routson of the assets of Dan Routson of Red Wing, Inc.[16] His purpose was to liquidate the dealership and to pay the obligations of Universal Pontiac, to the extent possible, from the proceeds. This, of course, included payment of the Norwest Floor Plan deficiency. Mr. Mattox testified that, after the liquidation, there existed a deficiency in the account in the amount of $326,621, which he and Universal Pontiac then paid, pursuant to their guarantees.

The Defendants mistakenly believe that the Plaintiffs must show a proper accounting for liquidation of the dealership as part of their burden of proof on damages sustained as a direct and proximate result of Defendant Daniel Routson's wrongful conversion. The Plaintiffs' action is not one for an accounting of the dealership, or breach of contract. The action is grounded in the torts of conversion, fraud, embezzlement and larceny.

14. Certain financial documents that found their way into evidence at trial seem to show a disappearing accounts receivable of Dan Routson of Red Wing, Inc., in the amount of $246,670, during the final phase of liquidation. The financial statements were among the exhibits to a pre-trial deposition of Mr. Routson that was offered into evidence by the Plaintiffs. The Plaintiffs did not specifically use the documents at trial, but Mr. Mattox could not explain what the accounts receivable represented or why the entry vanished from the later statements. The documents were prepared by his accountant during liquidation of the dealership.

15. Defendants offered testimony that certain used cars were sold at "fire sale" prices during the liquidation, resulting in lost potential receipts of as much as $70,000. They also claim that Mr. Mattox engaged in self-dealing by purchasing several vehicles personally at below market prices.

16. The assets of the two entities were commingled in the single dealership.

■ The Defendants seek to use the alleged accounting irregularities and questionable sales procedures as a basis for securing their own remedy against the Plaintiffs. In effect, they are asserting the affirmative defense of recoupment. Essentially, the principle of recoupment allows a defendant to reduce his liability on a plaintiff's claim by an amount that the defendant can show is due the defendant on his own claim against the plaintiff, arising out of the same transaction or relationship of the parties. *See American Cent. Airlines, Inc. v. Department of Transportation (In re American Cent. Airlines)*, 60 B.R. 587 (Bankr.N.D.Iowa 1986). It is an equitable remedy available to a defendant; and, it is defensive, in that no actual recovery is sought from the plaintiff.

■ The principle of recoupment presents an affirmative defense, in appropriate situations, to one who is the target of litigation. The burden of proof on matters raised in use of recoupment, is on the defendant who raises them.

The Defendants have not met the burden of proof necessary to establish a right to recoupment. The financial records of both Universal Pontiac and Dan Routson of Red Wing, Inc., were in disarray as a result of Mr. Routson's brief tenure of control over the dealership. There existed at least two sets of books, neither one of which presented an accurate account of the business. Complicating an already confusing situation, was the fact that Universal floor planned vehicles were not carried as assets on the books of Dan Routson of Red Wing, Inc., and the floor plan obligations were not shown on those books as liabilities. The documents complained of by the Defendants were apparently prepared for internal purposes and were not offered by the Plaintiffs to establish an accounting of the dealership. The Defendants' use of the documents, standing alone, proves nothing; and, the Defendants offered no accounting of their own regarding liquidation of the dealership.

Finally, the Defendants' evidence regarding Mr. Mattox's alleged wrongful disposition of certain of Routson's used cars at below market prices is not persuasive. The vehicles that were purchased by Mr. Mattox personally, were acquired through public auction for the highest bid. Regarding the "fire sale" of used cars, that opinion testimony is insufficient to establish that the liquidation was carried out in an unreasonable manner, especially under circumstances where it was performed in a crisis environment occasioned by Mr. Routson's own misconduct.

The Plaintiffs have proven damages in the amount of $326,621 that proximately resulted from Defendant Daniel Routson's conversion of Norwest collateral proceeds. Mr. Routson has not established a right to recoupment against any of the damages.

## V.

### DISPOSITION.

Based on the foregoing, it is **HEREBY ORDERED:**

1) The action is dismissed against Dan Routson of Red Wing, Inc. for lack of jurisdiction.

2) Defendant Teri Louise Routson is not liable to Universal Pontiac–Buick–GMC Truck, Inc., or to Gary E. Mattox, for any amount, either by her own conduct or in connection with the purchase and operation of Universal Pontiac by Daniel Routson on or about May 1, 1991, and thereafter.

3) Defendant Daniel Patrick Routson is liable to Universal Pontiac–Buick–GMC Truck Inc., and Gary E. Mattox, in connection with the purchase and operation of Universal Pontiac in the amount of $326,621; which obligation is not discharged by the general discharge entered in favor of the Debtor pursuant to 11 U.S.C. § 727(a) in Bankruptcy Case No. 3–91–6722, but is excepted therefrom pursuant to 11 U.S.C. § 523(a)(2)(A), (4) and (6).

**LET JUDGMENT BE ENTERED ACCORDINGLY:**