In re Bruce A. FEIST, Debtor.

Freida A. EHRMAN, Plaintiff,

v.

Bruce A. FEIST and Randi Feist, Defendants.

Bankruptcy No. 98–30124.
Adversary No. 98–7021.

United States Bankruptcy Court,
D. North Dakota.

Sept. 9, 1998.

See also 568 N.W.2d 747.

Michael Ward, Minot, ND, for plaintiff.

Max Rosenberg, Bismarck, ND, for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This adversary proceeding was commenced by Plaintiff Freida Ehrman ("Ehrman") by Complaint filed on May 1, 1998, and Amended Complaint filed on May 7, 1998, requesting that Debtor-defendant Bruce Feist ("Feist") be denied a discharge of debts, purportedly owed to Ehrman, pursuant to 11 U.S.C. § 523. This matter concerns a longstanding dispute between the parties which

has already been the subject of decisions from a North Dakota state district court, as well as, on appeal, the North Dakota Supreme Court in *Ehrman v. Feist,* 568 N.W.2d 747 (N.D.1997), and which appeared in this forum after Feist filed his voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code ("Code"). The state court action was commenced when Ehrman sought to evict Feist from farm property which he was renting from her, by alleging grounds of, inter alia, waste and failure to pay rent. Relatedly, in the instant matter, Ehrman alleges that Feist willfully and maliciously caused damage to her property in the aggregate amount of $55,000.00, and, further, that he failed to pay her rent in the amount of $20,000.00; debts which she contends should be declared nondischargeable. Trial was held in this matter on September 1, 1998. The Court's findings of fact[1] and its conclusions of law are as follows:

### Findings of Fact

Feist, age 44, resides near Towner, North Dakota. He worked on Ehrman's farm from the time he was eight or ten years old until he reached the age of seventeen. In the summer of 1991, Ehrman, now in her 70s, moved from the farm into town. In that same year, Bruce Feist, and his then-wife Anna Feist, rented the farm—which consisted of a farmhouse, barn, chicken coop, and several other outbuildings, along with an undisclosed acreage of pastureland—by oral agreement for the purpose of beginning a dairy operation. They moved onto the property in December 1991.

Before Feist could begin dairy production, and in preparation for seeking state approval of his proposed dairy operation, he made numerous improvements to the farm. For instance, he replaced the dirt floor and rotted wooden support posts of the barn with new ones made of concrete. Additionally, he reshingled the grainery; dug water lines for dairy and poultry production; rehung doors; built fences; and conducted overall maintenance and cleanup of the rental farm property. Additionally, he bought and installed a milking system in 1992. He did not, however, make every possible improvement to the leased property. For example, he left some unfinished electrical work and wires, which were hanging from the ceiling of the barn, as he found them when he rented the property from Ehrman.

Subsequently, in January 1993, he received a provisional six-month approval from the state milk inspector to begin dairy production. Thereafter, the barn and his dairy operation passed bi-annual inspections without ever being cited for any violations of state standards.

On August 12, 1993, Ehrman entered into a written, seven-year lease agreement with Bruce and Anna Feist.[2] Thereafter, in the fall of 1993, Feist began constructing a sixty-foot addition to the barn, which he finished in the spring of 1994. He continued to make improvements to the barn structure throughout his tenure on the farm, finishing sheeting on the inside of the barn in the spring of 1997. In all, Feist expended $65,786.66 towards barn improvements for his dairy operation. It appears that the First National Bank of McClusky ("Bank") may have held a security interest in these, and other assets of the debtor, as is reflected in Feist's Schedules.

During the course of his lease, Feist experienced several problems with the farm property. For instance, the roof to the chicken coop began to settle in, and its windows eventually buckled out. Additionally, one of

---

1. The Court has augmented the facts adduced at trial with information provided in the state court decisions to provide a more complete factual backdrop to this matter. For instance, these decisions revealed to the Court, where testimony at trial did not, the exact nature of Ehrman's ownership interest in the farm property.

2. The North Dakota District Court for the County of McHenry made the following findings, which were affirmed by the North Dakota Supreme Court in *Ehrman v. Feist,* 568 N.W.2d 747, 752 (N.D.1997): Ehrman owned a life estate in the leased property and her children were its remaindermen. However, in the lease, she misled Feist by representing that she owned the leased property. Because the lease contemplated a sale of the property, and because Feist invested his labor and money in making improvements to the property in contemplation thereof, Feist "was damaged by [Ehrman's] failure to disclose her limited ownership interest in the land." *Id.*

the barn doors was damaged, according to Feist, when a bull walked through it. Further, he experienced problems with flooding to the basement of the farmhouse, due to a combination of rain water running into it, after rainfall of seven inches in the area in the Fall of 1995, and inoperable drains. In the latter respect, Feist testified that he employed several plumbers to fix the drains, but that they were unable to do so. He stated that the water problem in the basement persisted for more than one year.

In 1997, Ehrman evicted Feist from the farm, citing, as grounds therefor, his alleged commission of waste and failure to pay rent. Feist was required to vacate the premises by December 15, 1997.

He subsequently removed himself from the property on December 14, 1997, along with numerous of the fixtures which were added to the barn during his tenure on the farm. In this connection, Feist removed barn fixtures which included much, if not most, of its milking equipment, as well as various plumbing, hardware, electrical, and other supplies or items. He testified that he did so, after being notified by the Bank that the fixtures constituted its collateral, under the assumption that they would be sold at auction in the spring of 1998.[3]

At trial, Feist testified that he left the farm in generally good condition, and, in many respects, much as he found it. The few photographs of the farm property which were received in evidence and which were taken prior to or around the time Feist rented it from Ehrman, contrasted against others taken after Feist vacated the premises, support his assertions in this regard. The barn appears much the same before Feist rented the farm property as it does after he vacated it, apart, that is, from the addition which Feist constructed thereon.

In particular, Feist testified that when he vacated the farm property, there was "nothing wrong" with the barn. In this respect, he asserted that it could be put back into usable form in three days' time with the reinstallation of the milking system. Further, he testified that he left the farmhouse in overall good condition, apart from the water problem in the basement. He stated that he did not cause the sewer system in the farmhouse to become blocked. He further stated that he caused no other damage to the house or to any other of the farm buildings.

However, Feist did leave large amounts of manure on the farm property, which, he testified, he ordinarily would have removed, explaining that the eviction deadline of December 15 left him no time to do so. He estimated that removal of the manure would take him three to four days.

Feist filed his voluntary Chapter 7 petition on January 29, 1998. In his Schedules, he lists Ehrman as holding an unsecured nonpriority claim of $12,000.00 for 1997 land rent.

In contrast, Ehrman contends in her Amended Complaint that Feist owes her "more than $20,000.00 in back rents"; $5,000.00 in "necessary" cleanup costs; and $50,000.00 for "malicious damage caused to her property;"[4] all of which she seeks to have declared nondischargeable pursuant to 11 U.S.C. § 523.[5] At trial, two witnesses testified on behalf of Ehrman, who did not make an appearance herself.

First, Albert Krueger ("Krueger"), Ehrman's nephew by marriage, testified as to

---

3. Feist has since stored the fixtures on property over which he exercises some control.

4. Ehrman explains the basis for this figure in her Amended Complaint, as follows:

[Feist] gutted the barn [by] taking out pipes and other equipment .... [tearing] out most of the electrical equipment [and] removing fixtures such as light fixtures and fans. The actions of the debtor maliciously and willfully caused the debtor injury in destroying the property of over $50,000.00 for which he would be indebted to [Ehrman]....

....

[Feist] did willful and malicious injury to the property of [Ehrman] ... by destroying the barn which [she] had paid roughly $70,000.00 for the construction of and which now has a value of less than $20,000.00 and which can no longer be used for milk production due to [his] vandalism[.]

5. Although she does not specify the subsection of Section 523 upon which she premises her nondischargeability action, it is readily apparent, under the alleged facts and the wording of her Complaint, that Ehrman is proceeding under Section 523(a)(6).

damage to farm property which was, in his view, caused by Feist. Krueger is also trustee of the Freida A. Ehrman Trust, a position he has held for an undisclosed number of years. As trustee, Krueger manages Ehrman's business affairs.

At trial Krueger testified that the lease dispute between Ehrman and Feist was four years old and that he was not involved in the matter from its inception. With regard to the leased property, Krueger testified that he never conducted an inspection of the farm while Feist resided on it, but rather did so only after Feist vacated the premises. In describing the farm's appearance after Feist quitted the property, he stated that the barn had been "stripped out," and that "basically, it was destroyed." In clarifying what he meant by "stripped out," Krueger listed numerous fixtures of the barn which had been removed by Feist, including milking equipment, pipes, barn doors, the ventilation system, and so on. Moreover, in his testimony on the subject of the barn, Krueger was of the belief that Feist was in some way the cause of the exposed electrical wires hanging from its ceiling. In this respect, he stated that electricians would need to rewire the barn. He also disputed Feist's assertion that the barn could be "up and running" as a dairy operation in three days' time. He stated that his contractor "said a lot of work was needed."

Further, he testified that Feist caused damage to other farm buildings as well, citing, as an example, the chicken coop. Krueger felt that Feist had removed or destroyed its windows. With respect to the farmhouse, he alleged that its sewage and drain systems were inoperable at the time Feist vacated it due to rags having been purposefully inserted into its pipes. He stated that he has since had the problem repaired.

Next, Anna Feist, who is now divorced from Bruce Feist, also testified on Ehrman's behalf at trial. She stated that there were no problems with the chicken coop when the couple moved onto the leased property. When viewing Plaintiff's Exhibit 4, a recent photo of the chicken coop, she stated that it "didn't look like that" when she resided on the farm. However, on cross-examination, she stated that she ceased living at the farm in 1993.

Nothing was presented or adduced at trial on the subject of any past-due rent which Feist owes to Ehrman. Similarly, nothing was presented or adduced on the subject of the estimated, or actual, cost of clean-up of the farm, in general, or of the manure, in specific. In this latter respect, Ehrman has simply alleged in her Amended Complaint that Feist left behind "huge piles of refuse[ ] throughout the farm and specifically in the barn," including "large amounts of manure" which were left "pil[ed] ... in and near the buildings." It does not appear from any document which she has filed with the Court, or from the testimony elicited at trial, that the sum of $5,000.00, or any sum, has been expended towards the removal of the manure or towards clean-up of the farm.

## Conclusions of Law

By this adversary proceeding, Ehrman seeks a determination that Feist's indebtedness to her, which she claims to aggregate $75,000.00, is nondischargeable pursuant to Code § 523(a)(6). She bears the burden of proof in this regard, the standard for which is proof by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *accord First Nat'l Bank v. Zinke (In re Zinke),* 174 B.R. 1017, 1021 (Bankr.D.N.D.1994); *Universal Pontiac–Buick–GMC Truck Inc. v. Routson (In re Routson),* 160 B.R. 595, 602 (Bankr.D.Minn.1993); *Valcour Printing, Inc. v. Poole (In re Poole),* 148 B.R. 49, 51 (Bankr.E.D.Mo.1992).

Turning to the statutory basis for her action, Section 523(a)(6) provides in pertinent part that, "[a] discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). Case law among the United States Circuit Courts of Appeals has long attempted to define the statutory language "willful and malicious," but with varying degrees of clarity.

However, within the Eighth Circuit, the statutory terminology was precisely delineated by several decisions, including the following: *Barclays American/Business Credit, Inc. v. Long (In re Long),* 774 F.2d 875 (8th Cir.1985), which elucidated, inter alia, the element of "maliciousness," and *Kawaauhau v. Geiger (In re Geiger),* 113 F.3d 848 (8th Cir.1997) (en banc), which, in turn, represents the Circuit's most recent elucidation of "willfulness." In *In re Long,* the Eighth Circuit held as follows:

> Congress tells us in [Section] 523(a)(6) that malice and willfulness are two different characteristics. They should not be lumped together to create an amorphous standard to prevent discharge for any conduct that may be judicially considered to be deplorable. We are convinced that if malice, as it is used in [Section] 523(a)(6), is to have any meaning independent of willful it must apply only to conduct more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from mere legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice, absent some additional "aggravated circumstances,"
> . . . .
> [N]ondischargeability turns on whether the conduct is (1) headstrong and knowing ("willful") and, (2) targeted at the creditor ("malicious"), at least in the sense that the conduct is certain or almost certain to cause financial harm.
> . . . .
> [U]nless [debtors] act with malice by intending or fully expecting to harm the economic interests of the creditor, [a willful] breach of contract does not, in and of itself, preclude a discharge.

*Id.* at 880–81, 882 (citations omitted).[6] In *In re Geiger,* the Circuit analyzed the term "willful" in the statute, and held in its regard, as follows:

> [I]n *Cassidy v. Minihan,* 794 F.2d 340, 344 (8th Cir.1986), our court, after a consideration of the legislative history of the revised act, held that Congress [with regard to the word "willful,"] had intended to "allow discharge of liability for injuries unless the debtor intentionally inflicted an injury."

The Sixth Circuit has put the question that is before us this way:

> Do the words "deliberate or intentional," contained in the legislative reports referred to above, require an "intentional act that results in injury" or "an act with intent to cause injury" before a judgment debt can be exempt from discharge? Posed this way, . . . . [w]e do not hesitate to adopt the latter construction. . . .
> . . . .
> We think that the correct rule is that a judgment debt cannot be exempt from discharge in bankruptcy unless it is based on what the law has for generations called an intentional tort. . . . Unless the actor "desires to cause the consequences of his act, or . . . believes that the consequences are substantially certain to result from it," he or she has not committed an intentional tort. [*Restatement (Second) of Torts*] § 8A at 15.
> In our case, there is no suggestion whatever that [the debtor-defendant] desired to cause the very serious consequences that [the plaintiff] suffered. . . . If, therefore, he was an intentional tortfeasor as we have defined that term, he would have to have believed that [the plaintiff] was substantially certain to suffer harm as a result of his actions.

*Id.* at 852.[7]

Subsequently, the Eighth Circuit's decision in *In re Geiger* was affirmed by the United

---

6. While *In re Long* applied its definition of "maliciousness" to transfers in breach of .securities agreements, "subsequent opinions of the Eighth Circuit have extended the definitions to other willful and malicious injuries." *Allstate Ins. v. Dziuk (In re Dziuk),* 218 B.R. 485, 487 (Bankr. D.Minn.1998) (citing, as example, *Johnson v. Miera (In re Miera),* 926 F.2d 741 (8th Cir.1991)).

7. As this Court noted in *Security Bank v. Wehri (In re Wehri),* 212 B.R. 963 (Bankr.D.N.D.1997):
   > It is observed that the new definition of "willfulness" is contrary to the generally accepted meaning of the word and seems at first blush to be at odds with previous decisions of the Eighth Circuit itself. Although the *Geiger* court specifically said it was not revisiting the

States Supreme Court in *Kawaauhau v. Geiger*, —— U.S. ——, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), where a unanimous Court performed the following analysis, substantially mirroring that of the Eighth Circuit, on the subject of willfulness in the context of Section 523(a)(6):

> We confront this pivotal question concerning the scope of the "willful and malicious injury" exception: Does § 523(a)(6)'s compass cover acts, done intentionally, that cause injury ..., or only acts done with the actual intent to cause injury ...? The words of the statute strongly support the [latter] reading.
>
> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, ... the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished form negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, comment a, p. 15 (1964) (emphasis added).

*Id.* at ——, 118 S.Ct. at 977 (footnote omitted). The Court went on to hold that, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at ——, 118 S.Ct. at 978. Of critical importance to this case, although *Geiger* concerned facts stemming from an incident of medical malpractice, and a malpractice judgment, it has since been applied unilaterally to *all* actions arising under Section 523(a)(6), *see, e.g., Salem Bend Condominium Assoc. v. Bullock–Williams (In re Bullock–Williams)*, 220 B.R. 345 (6th Cir. BAP 1998) (affirming bankruptcy court's dismissal of plaintiff's Complaint to have debtor's debt stemming from breach of contract excepted from discharge, under Supreme Court's holding in *Geiger*, "that the intent required for willful and malicious injury is the intent to cause the resultant harm"); *Florida Outdoor Equipment, Inc. v. Tomlinson (In re Tomlinson)*, 220 B.R. 134 (Bankr. M.D.Fla.1998) (debtor's act of retaining sale proceeds of secured creditor's inventory held not to be "willful" under Supreme Court's *Geiger* decision, and thus, not excepted from discharge); *Allstate Ins. v. Dziuk (In re Dziuk)*, 218 B.R. 485 (Bankr.D.Minn.1998) (debtor's act of setting fire to an icehouse adjacent to home, which fire then spread to home, held, inter alia, not to be "willful" under Supreme Court's *Geiger* decision, and debt therefrom held not to be excepted from discharge); and will be so applied in this Court.

■ Thus, in order for Ehrman to prevail in her nondischargeability action against Feist, she must establish both elements of Section 523(a)(6) by a preponderance of the evidence by demonstrating (1) that Feist acted to deliberately or intentionally injure her, and did not merely commit a deliberate or intentional act that led to her injury, *or* that Feist would have to have believed, at the time, that Ehrman would be substantially certain to suffer harm as a result of his actions ("willfulness"), *and,* if the second element to Section 523(a)(6) actions has not been rendered superfluous by the Eighth Circuit's, and then Supreme Court's, rulings in *Geiger*, (2) that in so doing, he intended or fully expected to harm her economic interests ("maliciousness").[8]

meaning of "maliciousness," when one reads the *Long* definition of maliciousness in tandem with *Geiger*'s new definition of willfulness, it appears the former definition of maliciousness has been subsumed by the newly expanded definition of willfulness. *Id.* at 968–69. The Court's concerns in this connection are similar to those raised by Circuit Judge Murphy in her dissent to *Geiger*, and in which she was joined by Circuit Judge McMillian.

8. See footnote seven. The problem of subsumption, with which this Court was concerned in *Wehri,* and with which the dissent was concerned in the Eighth Circuit's *Geiger* decision, is well illustrated when the holdings of *Long* and *Geiger* are juxtaposed and reconciled, as they are here.

Under this standard, Ehrman's non-dischargeability action against Feist must fail, for she has not met her burden of proof under either element of her Section 523(a)(6) action. In particular, Ehrman has not established that Feist's removal of fixtures from the barn, his failure to remove manure from the farm, or his failure to pay his rent obligations to her—whatever be their exact amount—were deliberate or intentional acts intended to cause her injury, as opposed to deliberate or intentional acts which only led to her injury, or that Feist would have to have believed at the time that she would be substantially certain to suffer harm as a result of his actions. Neither has she established that Feist so acted while intending or fully expecting to harm her economic interests.

Instead, the only evidence before this Court concerning Feist's removal of the fixtures indicates that he did so in order that they might be sold at auction by the Bank, as he believed them to be the Bank's collateral. The only evidence on the issue of Feist's failure to remove the piles of manure reveals that he did not have time to do so before being evicted. Lastly, no evidence was introduced on the subject of rent due and owing from Feist to Ehrman, not even the written lease agreement itself.

As concerns the destruction to the chicken coop, which Krueger alleges Feist committed, nothing has been presented to the Court by way of testimony or evidence which would link any alleged damage to (1) deliberate or intentional acts committed by Feist to injure Ehrman, or acts committed by Feist under the belief that Ehrman would be substantially certain to suffer harm as a result ("willfulness"), and (2) acts that he committed in this regard by which he intended or fully expected to harm her economic interests ("maliciousness"). Moreover, it is apparent from the sole photograph of the chicken coop which was received into evidence, that the structure is old and dilapidated, a fact which lends some credence to Feist's assertion that the structure simply succumbed to the natural forces of deterioration. Anna Feist's testimony that it was usable when she and Feist first rented the leased property does nothing to impugn his statement in this regard nor overcome the stark photographic depiction of the structure. More importantly, and as a threshold matter, Ehrman has failed to link any damage to the structure to any act or acts, either intentional or otherwise, committed by Feist.

Lastly, regarding Ehrman's assertions at trial that Feist purposefully disabled the sewer and drain systems to the farmhouse, thereby flooding its basement and causing an unspecified amount of damage, the Court has been presented with only the conflicting testimony of Feist and Krueger. Neither party introduced any evidence or testimony, apart from their own, on this subject. Moreover, Krueger did not inspect the farmhouse until after Feist vacated it. Thus, the Court can only conclude that Ehrman has failed here, too, in her burden of proof under Section 523(a)(6). Again as an threshold matter, she has not established by a preponderance of the evidence that Feist acted in any way to cause the basement flooding.

In sum, although it was established that Feist removed numerous fixtures from the barn, failed to remove an accumulation of manure on the farm, and further failed to pay at least $12,000.00 in rent to Frieda under the lease, Ehrman has failed to meet her burden of proof under Section 523(a)(6) by demonstrating that Feist acted willfully and maliciously in doing so, or, as she alleged, in causing any damage to either the chicken coop or to the farmhouse.

## Conclusion

For the foregoing reasons, the Amended Complaint of Freida A. Ehrman, based upon 11 U.S.C. § 523(a)(6) is DISMISSED.

JUDGMENT MAY BE ENTERED ACCORDINGLY.

**SO ORDERED.**