In re Shawn NOVOTNY, Debtor.

Craig and Pat DENNIS, Plaintiffs,

v.

Shawn NOVOTNY, Defendant.

Bankruptcy No. 98–30648.
Adversary No. 98–7033.

United States Bankruptcy Court,
D. North Dakota.

Oct. 15, 1998.

212

Gary Ramsey, Dickinson, ND, for plaintiff.

Jack McDonald, Jr., Bismarck, ND, for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The following Adversary Proceeding was commenced by the creditor-plaintiffs, Craig and Pat Dennis, by Complaint filed on June 15, 1998, against the debtor-defendant, Shawn Novotny. By their Complaint, the Dennises seek to have a debt in excess of $100,000.00 declared nondischargeable in the debtor's bankruptcy case pursuant to 11 U.S.C. § 523(a)(6), under the exception it creates to discharge for, inter alia, "any debt for willful and malicious injury by the debtor

to another entity." The debt at issue arises from a civil judgment entered in the Dennises' favor against Shawn Novotny in the District Court for Stark County, State of North Dakota, for the wrongful death of their daughter, Amy Dennis. It was the state district court's finding in that proceeding that Shawn Novotny "intentionally and maliciously shot Amy Dennis in the back of the head which ultimately caused her death." A trial was held in the instant matter before the undersigned on October 6, 1998. At trial, the parties entered into a Stipulation of Facts, which was subsequently filed with this Court on October 13, 1998. This information was supplemented by trial exhibits which were introduced into evidence by the plaintiffs, and received by the Court, and by trial testimony adduced from two witnesses testifying on behalf of the plaintiffs, and whose testimony is uncontroverted in these proceedings.

### I. Findings of Fact

From the parties' Stipulation of Facts, and from the uncontroverted evidence adduced at trial, the Court now makes the following findings of fact: On April 17, 1994, Lieutenant Charles Rummel of the Criminal Investigative Division of the Dickinson Police Department, Dickinson, North Dakota,[1] was notified of, and responded to, what was then considered to be a possible homicide at a residence located at 124 B Avenue East, Dickinson, North Dakota, and described as a brown-colored, single-story A-frame dwelling with a partial attic. He arrived at the address shortly thereafter, at 5:30 p.m. The dwelling belonged to the parents of Shawn Novotny, the debtor-defendant. After speaking with two officers who preceded his arrival, Lt. Rummel undertook the examination of the scene.

The parents resided on the ground floor of the dwelling, which consisted of, inter alia, two bedrooms and a living room. Shawn Novotny resided in the upstairs attic, which measured approximately twenty-five feet in length and fifteen feet in width, and had a

---

1. Lt. Rummel was the officer in charge of the crime scene and investigation into the death of Amy Dennis. He has more than twenty years' experience as a police officer and has conducted many hundreds of criminal investigations in the course of his employment with the Dickinson Police Department. His duties presently include the oversight of investigations into criminal activity in Dickinson, as well as the command of major crime scenes in the city.

low-slung ceiling measuring only six feet at its highest point and sloping down to less than half that at its edges. The space was accessible only through his parents' bedroom, where, behind a curtain, a carpeted flight of very narrow, vertical steps led, ladder-like, to the two rooms upstairs. The rooms were separated by an interior dividing wall.

The first room off the stairway was used by Shawn Novotny as his living space and as an office of sorts. At the time Lt. Rummel surveyed the crime scene, the contents of this room included a desk and chair, a floor fan, a profusion of clutter and electronic components, and a bloody t-shirt, which was later learned to be that of Shawn Novotny.

The squarish room beyond the office was Shawn Novotny's bedroom. Entry was gained into the room through a doorway positioned mid-way along the interior dividing wall separating the office from the bedroom. The walls of the bedroom were covered in light-colored, wood-grained paneling. The floor was covered in a maroon and black carpeting. To the immediate left of the entryway stood a brick chimney. At the center of the exterior wall opposite the entryway was the room's only window, which was open at the time of the investigation, with its curtains partially drawn.

At the time Lt. Rummel surveyed the scene, the bedroom, viewed in a counterclockwise fashion from the entryway in the dividing wall, contained the following placement of objects: (1) to the immediate right, against the back of the dividing wall, was a television set; (2) directly in front of the television set, along the length of the adjacent exterior wall was a mattress, upon which lay a five-millimeter rifle, a bloodstained video game hand control, an accumulation of blood, a blood-stained and broken tubular fluorescent light bulb, and the body of Amy Dennis—at her foot, a shell casing from the rifle; in her left hand, a handwritten note; and emanating from a bullet wound to her head, a profusion of blood; (3) proceeding past the window in the exterior

wall, to the corner that it formed with the exterior wall directly opposite the body, were audio speakers and scattered pieces of a model train set; (4) along the floor of the exterior wall opposite the body were a stuffed animal on which a framed portrait photograph of Amy Dennis rested askew, a largely intact portion of a shattered drinking glass, an I.D. bracelet, a knife, and a necklace; and, lastly, (5) just to the left of the entryway: a large accumulation of glass fragments on the floor area surrounding the chimney. Downstairs, the police investigators observed a glass-faced gun cabinet in the parents' living room; an open, small cedar chest containing various types of bullets on the bed in one of the two ground floor bedrooms; bullets and a shotgun shell on the bed around the cedar chest; and, on the bed in the parents' bedroom, computer discs, a small red computer case, and a grey nylon-looking zippered bag with a black shoulder strap.

After viewing the crime scene, Lt. Rummel proceeded to St. Joseph Hospital to interview Shawn Novotny, who had been taken to St. Joseph's by ambulance for treatment of self-inflicted gunshot wound inflicted with the rifle which he used to kill Amy Dennis. In their first interview at St. Joseph's, on the day of the shooting, and in another at MedcenterOne in Bismarck, North Dakota, which took place the day after the shooting, Lt. Rummel observed that Shawn Novotny was clear of mind, coherent, alert, and aware of Lt. Rummel's identity.[2] During the course of these two meetings, he confessed to Lt. Rummel that he shot Amy Dennis with his father's five-millimeter rifle and then had turned the gun on himself.

Describing the course of events which culminated in the death of Amy Dennis and in his self-inflicted gunshot wound, Shawn Novotny stated that he and Amy Dennis had been boyfriend and girlfriend. At approximately 11:00 a.m. on April 17, 1994, Amy Dennis called him to tell him that she would be coming over to his house. During the

**2.** In this last respect, Shawn Novotny, on first meeting Lt. Rummel in the hospital, asked the lieutenant to greet his son, Scott Rummel, for him, as the two were classmates in high school.

On his second meeting with the lieutenant, Shawn Novotny inquired of Lt. Rummel whether he had greeted Scott for him as he had previously requested.

course of their telephone conversation, Shawn Novotny threw a drinking glass against the chimney of his bedroom, shattering the glass.

Amy Dennis arrived at the house between 11:30 a.m. and 12:00 p.m. At that time, Shawn Novotny believed that they were going to make-up. However, Amy Dennis had come to break up with him and to retrieve jewelry from him, along with some computer discs which she needed for one of her courses at Dickinson State University, where she was a first-year student. An argument ensued, during which Shawn Novotny, in words which he repeated to Lt. Rummel, "snapped." He told Lt. Rummel that he then went to get a gun to shoot Amy Dennis.

In carrying out the shooting, Shawn Novotny stated that he took a rifle from his father's gun cabinet in the downstairs living room. The gun was unloaded, and he proceeded to retrieve rifle bullets from a small cedar chest in one of the downstairs bedrooms. He then returned to the attic, loading the rifle in his bedroom, where Amy Dennis was present.

Physical evidence from the crime scene, including the location of the bullet wound to Amy Dennis and the position of her corpse, as well as crime scene photographs, enabled Lt. Rummel to reconstruct the following additional events surrounding the shooting: After loading the rifle, Shawn Novotny stood at the edge of the mattress upon which Amy Dennis was seated. He pointed the barrel of the rifle at Amy Dennises' head. Amy Dennis was in a crouched position at that time, with her head turned away from the barrel of the rifle and with her hands placed over her face as if she were cowering. The distance from the tip of the rifle barrel to Amy Den-

nises' head was possibly as little as two feet, but was no more than four feet. Shawn Novotny then pulled the trigger of the rifle, causing it to discharge a bullet which entered into the right rear quadrant of Amy Dennises' head, just above her right ear. The injuries Amy Dennis sustained as a result of the shooting led to her death.

Sometime thereafter, Shawn Novotny shot himself with the rifle in an apparent attempted suicide. He was taken by ambulance to St. Joseph Hospital, and subsequently to MedcenterOne, and survived.

The shooting death of Amy Dennis resulted in the criminal prosecution of Shawn Novotny in Stark County, North Dakota, for the offense of Murder, a Class AA Felony in violation of Section 12.1–16–01(1) of the North Dakota Century Code.[3] However, on March 7, 1995, Shawn Novotny entered into a plea agreement with a representative of the Office of Stark County State's Attorney, whereby he agreed to plead guilty to, inter alia, the lesser criminal offense of Murder, a Class A Felony in violation of Section 12.1–16–10(2) of the North Dakota Century Code.[4] The agreement was approved by the District Court for Stark County, Case No. 94K–20, the Hon. Maurice R. Hunke presiding, in a Plea Agreement and Criminal Judgment entered on March 9, 1995, which provided, in pertinent part, as follows:

> The parties did ... offer the Court a negotiated plea agreement. ...

> The Court having been presented with said plea agreement, did determine that the Defendant, Shawn S. Novotny, did willingly, knowingly, and unconditionally consent and agree to all the terms and conditions set forth herein. Further, the Court

---

3. Section 12.1–16–01(1) provides, in relevant part, as follows:
 A person is guilty of murder, a class AA felony, if the person:
 a. Intentionally or knowingly causes the death of another human being;
 . . . .
 N.D.C.C. § 12.1–16–01(1).

4. Section 12.1–16–01(2) provides that:
 A person is guilty of murder, a class A felony, if the person causes the death of another human being under circumstances which would be class AA felony murder, except that the person causes

the death under the influence of extreme emotional disturbance for which there is reasonable excuse. The reasonableness of the excuse must be determined from the viewpoint of a person in that person's situation under the circumstances as that person believes them to be. An extreme emotional disturbance is excusable, within the meaning of this subsection only, if it is occasioned by substantial provocation, or a serious event, or situation for which the offender was not culpably responsible.
N.D.C.C. § 12.1–16–01(2).

determined that the Defendant was not now suffering from any known or recognized mental or physical illness or disease which would preclude the Defendant from understanding each and every condition of said plea agreement, nor was the Defendant under the influence of alcohol, narcotics or medication.

The Court did then determine that there existed a factual basis for the criminal charge and the Defendant's plea of guilty thereof, and did further determine that said plea agreement was reasonable as to the interests of all parties concerned and informed the Defendant that the Court would accept the plea agreement as offered.

The Court did then accept the plea of guilty as offered by the Defendant, to the criminal offense of: **MURDER**, a Class A Felony in violation of N.D.C.C. Section 12.1–16–01(2). The Court further accepted the stipulation of the State and the Defendant that the Defendant was a special offender, pursuant to N.D.C.C. Section 12.1–32–09.

The Court then determined that the Defendant offered no legal cause so as to preclude the imposition of sentence or penalty at this time.

IT IS THEREFORE THE ORDER of the Court that the Defendant, Shawn S. Novotny, having been convicted of the criminal offense: **MURDER**, a Class A Felony in violation of N.D.C.C. Section 12.1–16–01(2), and having been determined to be a dangerous special offender pursuant to N.D.C.C. Section 12.1–32–09, shall be sentenced to serve a term of thirty (30) years from the date hereof in the North Dakota State Penitentiary. He shall receive credit against his sentence for time served in custody prior to the date hereof. The last five (5) years of said sentence shall be suspended on the following conditions:

1) That the Defendant shall make restitution in the amount of $9,000.00 to the family of Amy Dennis. Payments are to be made through the Clerk of District Court for Stark County, North Dakota, on a schedule to be prepared by Defendant's probation officer.

. . . .

(Emphasis in the original).

Thereafter, the Dennises commenced a civil action in the District Court for Stark County, Case No. 96–C–105, the Hon. Maurice R. Hunke again presiding, for the wrongful death of their daughter. Based upon "all pleadings of record, together with [a] Stipulation for Entry of Judgment signed by [the Dennises and Shawn Novotny] and their attorneys," [5] the state district court entered its Findings of Fact, Conclusions of Law, and Order for Judgment on January 21, 1997, which provided as follows:

### FINDINGS OF FACT

1. Plaintiffs Craig Dennis and Pat Dennis are the parents of Amy Dennis, deceased. Craig Dennis and Pat Dennis have authority to represent the estate interests of Amy Dennis in this particular matter.

2. On April 17, 1994, Defendant Shawn Novotny intentionally and maliciously shot Amy Dennis in the back of the head which ultimately caused her death.

3. As a result of Defendant's actions, Plaintiffs have been deprived of consortium they would otherwise have enjoyed with their daughter.

From the findings of fact, the Court makes its

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties to this action and the subject matter of this litigation.

2. Pursuant to the parties' Stipulation for Entry of Judgment, Plaintiffs Craig

---

5. The parties' signed Stipulation for Entry of Judgment provided, in full, as follows:

The parties to this lawsuit have stipulated and agreed that a Judgment can be entered against the Defendant for the amount of $100,000.00 plus costs and disbursements herein. All other terms of the parties' Stipulation and Agreement for entry of this Judgment and resolution of this lawsuit, are to be held in confidence and not disclosed in any way, shape, manner or form.

Dennis and Pat Dennis are entitled to have judgment against Defendant Shawn Novotny in the amount of $100,000.00 together with their costs and disbursements herein.

The state district court reiterated its conclusions of law in a further Judgment entered on February 7, 1997. A Statement of Judgment, issued from North Dakota's Unified Court Information System, indicates that the Dennises' costs and disbursements aggregated $95.00 in this matter, and that the civil judgment accumulates post-judgment interest at the rate of twelve percent per annum.

## II. Conclusions of Law

■ By the instant adversary proceeding, the Dennises seek a determination that Shawn Novotny's indebtedness to them, which currently aggregates in excess of $100,000.00, is nondischargeable pursuant to Section 523(a)(6) of the United States Bankruptcy Code. In this respect, they carry the burden of proof, the standard for which is proof by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *accord First Nat'l Bank v. Zinke (In re Zinke),* 174 B.R. 1017, 1021 (Bankr.D.N.D.1994); *Universal Pontiac–Buick–GMC Truck Inc. v. Routson (In re Routson),* 160 B.R. 595, 602 (Bankr.D.Minn.1993); *Valcour Printing, Inc. v. Poole (In re Poole),* 148 B.R. 49, 51 (Bankr.E.D.Mo.1992). Section 523(a)(6) provides in pertinent part that, ."[a] discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for willful and malicious injury by the debtor to another entity." 11 U.S.C. § 523(a)(6).

Counsel for the defendant, while conceding that the element of "willfulness" has been met in this matter, argues that the element of "maliciousness" has not. He does so based upon an undisclosed inference of "emotional disturbance" on the part of Shawn Novotny at the time of the shooting which, he implies, precluded his client's ability to form the requisite malice under the Section 523(a)(6). In this connection, counsel references the state district court's March 9, 1995 Plea Agreement and Criminal Judgment, under which Shawn Novotny was convicted of Murder, a Class A Felony in violation of N.D.C.C. § 12.1–16–01(2), for "caus[ing] the death of another human being under circumstances which would be class AA felony murder, except that the person causes the death *under the influence of extreme emotional disturbance for which there is reasonable excuse.*" N.D.C.C. § 12.1–16–01(2).

■ The Court first pauses to reiterate and emphasize that this criminal judgment was entered into pursuant to a plea agreement. Although Shawn Novotny was thereby spared trial under, and the possible conviction of, Class AA felony murder, the criminal statute under which he entered his guilty plea declares only his *"emotional disturbance"* at the time of the shooting to be reasonably excused, *not the crime itself.* Nothing in the state district court's criminal or civil judgments against Shawn Novotny in any way negates or precludes a finding of malice on his part for the murder of Amy Dennis. Indeed, the state district court so found in the civil proceedings which produced its January 21, 1997 Judgment.

Furthermore, although his counsel has repeatedly implied that Shawn Novotny was incapable of forming malice at the time of the shooting, as is required under Section 523(a)(6) in order that his debt be declared nondischargeable, said counsel has introduced no evidence of any sort in support of such assertions. In sum, there is nothing now before the Court which would in any way preclude it from concluding that Shawn Novotny acted with "malice," as that term is understood pursuant to Section 523(a)(6) of the United States Bankruptcy Code, in murdering Amy Dennis.

■ Turning now to the matter at hand, this Court has discussed Section 523(a)(6) in numerous opinions, and did so most recently in *Ehrman v. Feist (In re Feist),* 225 B.R. 450 (Bankr.D.N.D.1998), in light of the United States Supreme Court's ruling in *Geiger v. Kawaauhau,* — U.S. —, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) [hereinafter referred to as *"Geiger "*]. There the Supreme Court, in affirming the Court of Appeals for the Eighth Circuit in *Kawaauhau v. Geiger (In re .Geiger),* 113 F.3d 848 (8th Cir.1997) (en banc) [hereinafter referred to as *"In re Geig-*

er "], and in adopting the bulk of the Circuit's analysis therein, redefined the statutory element of "willfulness" in an unanimous opinion. Under the Supreme Court's ruling in *Geiger*:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.... Moreover, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself."

*Id.* at ——, 118 S.Ct. at 979 (quoting Restatement (Second) of Torts § 8A, comment a, p. 15 (1964)).[6] The Supreme Court went on to hold that, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at ——, 118 S.Ct. at 978.

Concerning the second element which must be proven under Section 523(a)(6), that of "malice" or "maliciousness," the Eighth Circuit has found the term to signify, "conduct 'targeted at the creditor at least in the sense that the conduct is certain or almost certain to cause harm.' " *Waugh v. Eldridge (In re Waugh)*, 95 F.3d 706, 711 (8th Cir. 1996) (quoting *Barclays Am./Business Credit Inc. v. Long (In re Long)*, 774 F.2d 875, 881 (8th Cir.1985)).[7] However, as this Court observed in *Security Bank v. Wehri (In re Wehri)*, 212 B.R. 963 (Bankr.D.N.D.1997), in the wake of the Eighth Circuit's ruling in *In re Geiger*:

> It is observed that the new definition of "willfulness" is contrary to the generally accepted meaning of the word and seems at first blush to be at odds with previous decisions of the Eighth Circuit itself. Although the *In re Geiger* court specifically said it was not revisiting the meaning of "maliciousness," when one reads the *Long* definition of maliciousness in tandem with [*In re Geiger's*] new definition of willfulness, *it appears the former definition of maliciousness has been subsumed by the newly expanded definition of willfulness.*

*Id.* at 968–69 (emphasis added). Concerns in this same vein were recently echoed by the bankruptcy court in *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9 (Bankr.D.Me. 1998), in light of the Supreme Court's *Geiger* ruling. As the *Slosberg* Court observed:

> Establishing malice can no longer rest upon demonstrating intent to cause injury as it did ... prior to [*Geiger*]. Malice must add something to the [Section] 523(a)(6) equation. But what?
>
> . . . .
>
> Earlier cases from the Eighth and other circuits, declaring that a wrongful act was malicious if it were "targeted at the creditor," suffer the same fate as other pre-[*Geiger*] malice formulations: The content they ascribe to the statute's malice element is now subsumed in the [*Geiger*] definition of willfulness.

*Allstate Ins. v. Dziuk (In re Dziuk)*, 218 B.R. 485 (Bankr.D.Minn.1998) (debtor's act of setting fire to an icehouse adjacent to home, which fire then spread to home, held, inter alia, not to be "willful" under Supreme Court's *Geiger* decision, and debt therefrom held not to be excepted from discharge); and has been so applied in this Court, *see Ehrman v. Feist (In re Feist)*, 225 B.R. 450 (Bankr.D.N.D.1998).

---

**6.** Although *Geiger* concerned facts stemming from an incident of medical malpractice, and a malpractice judgment, it has since been applied unilaterally to *all* actions arising under Section 523(a)(6), *see, e.g., Salem Bend Condominium Assoc. v. Bullock–Williams (In re Bullock–Williams)*, 220 B.R. 345 (6th Cir. BAP 1998) (affirming bankruptcy court's dismissal of plaintiff's Complaint to have debtor's debt stemming from breach of contract excepted from discharge, under Supreme Court's holding in *Geiger*, "that the intent required for willful and malicious injury is the intent to cause the resultant harm"); *Florida Outdoor Equip., Inc. v. Tomlinson (In re Tomlinson)*, 220 B.R. 134 (Bankr. M.D.Fla.1998) (debtor's act of retaining sale proceeds of secured creditor's inventory held not to be "willful" under Supreme Court's *Geiger* decision, and thus, not excepted from discharge);

**7.** While *In re Long* applied its definition of "maliciousness" to transfers in breach of securities agreements, "subsequent opinions of the Eighth Circuit have extended the definitions to other willful and malicious injuries." *Allstate Ins. v. Dziuk (In re Dziuk)*, 218 B.R. 485, 487 (Bankr. D.Minn.1998) citing, as an example, *Johnson v. Miera (In re Miera)*, 926 F.2d 741 (8th Cir.1991).

*Id.*, at 20.[8]

The challenge now before the Court becomes how best to reconcile the definition of "willfulness," as it has been recast under the Supreme Court's *Geiger* ruling, with the Eighth Circuit's pre-*In re Geiger* definition of "maliciousness." Ascribing a collective, unitary meaning to the two elements, an approach to the subsumption problem which was recently adopted by the United States Court of Appeals for the Fifth Circuit in *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598 (5th Cir.1998), is not an avenue presently available to this Court, as it must continue to adhere to the Eighth Circuit's unambiguous instruction to keep the two statutory elements separate and meaningfully distinct. As the Circuit pointedly declared in *Barclays Am./Business Credit Inc. v. Long (In re Long)*, 774 F.2d 875 (8th Cir. 1985):

> Congress tells us in [Section] 523(a)(6) that malice and willfulness are two different characteristics. They should not be lumped together to create an amorphous standard to prevent discharge for any conduct that may be judicially considered to be deplorable. We are convinced that if malice, as it is used in [Section] 523(a)(6), is to have any meaning independent of willful it must apply only to conduct more culpable....

*Id.* at 880–81. Subsequently, the Circuit revisited its concern that independent meanings be maintained between the two statutory elements, by stating in this regard, in *Johnson v. Miera (In re Miera)*, 926 F.2d 741 (8th Cir.1991), that, "malice must apply to a heightened level of culpability ... if it is to have a meaning independent of willful." *Id.* at 743. In short, the Circuit's position on this point can be summarized in the apt description of a noted bankruptcy commentator and practitioner: "[t]he element requires a heightened level of culpability which transcends mere willfulness." George H. Singer, *Section 523 of the Bankruptcy Code: The Fundamentals of Nondischargeability in Consumer Bankruptcy*, 71 Am.Bankr.L.J. 325, 377 (1997).

▮ As the Eighth Circuit expressly declined to address the element of "maliciousness" in its *In re Geiger* opinion, and as the Supreme Court's inquiry in *Geiger* was similarly circumscribed, it would appear that *Long* and *Miera* continue to have controlling effect within this Circuit on the subject of the element of "maliciousness" for purposes of Section 523(a)(6). Therefore, and in accordance the dictate of these opinions, if "maliciousness" continues to have a meaning independent of "willfulness" as that term has been redefined in *Geiger,* and one which, in order to maintain its integrity apart from "willfulness," applies to a "heightened level of culpability" on the part of the debtor, then this Court is of the belief that "maliciousness" under Section 523(a)(6) is not only conduct targeted at the creditor in the sense that the conduct is certain or almost certain to cause harm, but is also conduct "*committed without just cause or excuse.*" *Tinker v. Colwell,* 193 U.S. 473, 486, 24 S.Ct. 505, 48 L.Ed. 754 (1904); *see In re Slosberg,* 225 B.R. at 20–21.[9] In this way, "Section

8. The subsumption problem was previously illustrated by this Court in *Ehrman v. Feist (In re Feist)*, 225 B.R. 450 (Bankr.D.N.D.1998). Juxtaposing the new standard for "willfulness" under *Geiger*, with that for "maliciousness" as defined under previously discussed Eighth Circuit case law, the Court stated the nondischargeability standard applicable to the facts of that case, in which the plaintiff alleged that the defendant had willfully and maliciously injured her economic interests, to be as follows:

> [I]n order for [Plaintiff] Ehrman to prevail in her nondischargeability action against [Defendant] Feist, she must establish both elements of Section 523(a)(6) by a preponderance of the evidence by demonstrating (1) that Feist acted to deliberately or intentionally injure her, and did not merely commit a deliberate or intentional act that led to her injury, *or* that Feist

> would have to have believed, at the time, that Ehrman would be substantially certain to suffer harm as a result of his actions ("willfulness"), *and,* if the second element to Section 523(a)(6) actions has not been rendered superfluous by the Eighth Circuit's, and then Supreme Court's, rulings in *Geiger,* (2) that in so doing, he intended or fully expected to harm her economic interests ("maliciousness").

> *Id.,* at 455. As the confluence of these standards demonstrates, the first element of the statute, as defined in the case law, has so far encroached upon the meaning of the second as to render it redundant, and therefore, meaningless.

9. As the *Slosberg* Court observes, this language from *Tinker* on the element of "malice" was left undisturbed by the *Geiger* Court. Moreover, it is does not appear to have been included in the

523(a)(6) malice can have meaning ... that adds something to the statute's willfulness requirement[, .... while at the same time] withdraw[ing] from the discharge exception obligations arising from acts done knowing that injury is a substantially certain consequence, but done for reasons that justify or excuse the act." *Id.*

 It is this Court's considered determination, consistent with Section 523(a)(6) of the Bankruptcy Code, that on April 17, 1994, Shawn Novotny did act willfully in shooting Amy Dennis in the head at point blank range with a five-millimeter rifle, and in killing her. In this respect, the Court concludes that Shawn Novotny intended the consequences of that act, that is, Amy Dennises' death, and not simply the act itself. Concomitantly, the Court concludes that Shawn Novotny acted with malice when he murdered Amy Dennis; that is, the Court determines that his conduct was (1) targeted at Amy Dennis in the sense that it was certain to cause her ultimate harm, namely, her death, and (2) committed without just cause or excuse. Indeed, the criminal act which Shawn Novotny committed against Amy Dennis on April 17, 1994, can only be described as an *execution,* occurring far outside the law and all moral compass. Let there be no doubt, debts resulting from injuries sustained as a result of a criminal act committed under facts such as those present in the instant matter can only be described as willful and malicious, and must then be, per se, nondischargeable pursuant to Section 523(a)(6).[10]

### III. Conclusion

For the foregoing reasons, the Judgment of the District Court for Stark County, State of North Dakota, Case No. 96–C–105, entered in the favor of Craig and Pat Dennis and against Shawn Novotny on January 21, 1997 in the amount of $100,000.00, together with the Dennises' costs and disbursements in that proceeding, is hereby declared **NONDISCHARGEABLE** pursuant to 11 U.S.C. § 523(a)(6).

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

**SO ORDERED.**

Congressional repudiation of *Tinker's* "willfulness" standard through the enactment of 11 U.S.C. § 523(a)(6), and, further, is not contrary to Eighth Circuit case law on this subject. *See* H.R.Rep. No. 595, 95th Cong., 2d Sess. 365, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 6320–21; *Geiger v. Kawaauhau (In re Geiger),* 113 F.3d 848, 851 (8th Cir.1997); *Johnson v. Miera (In re Miera),* 926 F.2d 741, 744 (8th Cir.1991); *Hartley v. Jones (In re Hartley),* 869 F.2d 394, 395 (8th Cir.1989); *Cassidy v. Minihan,* 794 F.2d 340, 343 (8th Cir.1986).

**10.** Indeed, as Judge Bowman, Chief Judge of the Court of Appeals for the Eighth Circuit, expressed in his dissent in *Hartley v. Jones (In re Hartley),* 869 F.2d 394 (8th Cir.1989), "a claim for injury resulting from an assault ... should always be nondischargeable under § 523(a)(6). More broadly, I doubt that Congress intended that claims for injuries resulting from intentional torts should be dischargeable. Certainly, we should not lightly infer that Congress has created a safe haven in the Bankruptcy Code for intentional tortfeasors." *Id.* at 396 n. 1. Where, as here, a murderous act devoid of any excuse or justification has been committed, the Code cannot be subverted to shield its actor from its consequences.